CHARLES J. GAYLER AND LEONARD BROWN, PLAINTIFFS IN ERROR, *v.* BENJAMIN G. WILDER.

An assignment of a patent right, made and recorded in the Patent-Office before the patent issued, which purported to convey to the assignee all the inchoate right which the assignor then possessed, as well as the legal title which he was about to obtain, was sufficient to transfer the right to the assignee, although a patent afterwards was issued to the assignor.

When an assignment is made, under the fourteenth section of the act of 1836, of the exclusive right within a specified part of the country, the assignee may sue in his own name, provided the assignment be of the entire and unqualified monopoly. But any assignment short of this is a mere license, and will not carry with it a right to the assignee to sue in his own name.

Therefore, an agreement that the assignee might make and vend the article within certain specified limits, upon paying to the assignor a cent per pound, reserving, however, to the assignor the right to establish a manufactory of the article upon paying to the assignee a cent per pound, was only a license; and a suit for an infringement of the patent right must be conducted in the name of the assignor.

Where a person had made and used an article similar to the one which was afterwards patented, but had not made his discovery public, using it simply for his own private purpose, and without having tested it so as to discover its usefulness, and it had then been finally forgotten or abandoned, such prior invention and use did not preclude a subsequent inventor from taking out a patent.

THIS was a writ of error to the Circuit Court of the United States for the Southern District of New York.

The defendant in error (who was plaintiff in the court below) brought an action against Gayler and Brown (the plaintiffs in

error), for an alleged infringement of a patent right for the use of plaster of Paris in the construction of fire-proof chests.

In the declaration, it was averred that one Daniel Fitzgerald was the original and first inventor of a new and useful improvement in fire-proof chests or safes, and that letters patent were granted him therefor, bearing date the 1st day of June, 1843. The patent was in the usual form, and was set out in the declaration, the specification annexed to which was as follows : —

"To all whom it may concern :

"Be it known that I, Daniel Fitzgerald, of the city, county, and State of New York, and a citizen of the United States, have discovered and made an improvement, new and useful, in the construction of iron chests, or safes, intended to resist the action of fire, and for the safe-keeping and preserving books and papers, and other valuables, from destruction by fire, which I call a Salamander safe or chest.

"The following is a full and exact description of the safe or chest, with my improvement combined therewith :

"I make two iron chests, in the common and ordinary way of making iron chests, which is well known to those engaged in this branch of business, one smaller than the other, which, when the safe is put together, forms the inner chest, or inner part of the safe. The other chest is made about three inches larger than the inner one, and so as, when put together, it will form the outer part or crust of the safe, and leave a space between the inner and outer chests of the safe of about three inches; which space may vary a little, more or less, when the chests are put together, but should be the same all round, and in every direction. The inner and outer doors, where two doors are used, are prepared in the same way, leaving a space, as above, between the inner and outer crust of each door, which space is left for a like purpose with that left between the inner and outer chest of the safe. Where one door is used, it should be made in the same manner, leaving a like space between the inner and outer crust or face of the door, and for a like purpose, and should be fitted to the chest or safe with great accuracy. The edges and openings for the doors are to be neatly finished, as in other chests. I then take plaster of Paris or gypsum, and, having boiled it or baked it in an oven, and calcined it, and reduced it to a powder, I mix it with water till it is about the consistency of cream or thin paste, so fluid as that it may readily be poured into the space left as above to receive it, and I then fill all the space with the plaster of Paris, putting in some sheets of mica between the inner and outer chest, to aid, if necessary, in checking the progress of the heat.

" But where pains are taken to have all the space left for the purpose properly filled with the plaster of Paris, as above, so that when set it will expand and adhere firmly to the surrounding parts, and completely fill the whole space, and all the cracks and joints, the mica may be dispensed with, and every other substance, and the plaster may be used alone. It may also be reduced to a powder, without being prepared as above, and used in that state ; but I have not found it as good.

" The inner case or chest may be made of wood instead of iron, as for a bookcase, and if the space left between that and the outer chest be filled in the manner and with the materials above named, it will make a very durable safe, that will effectually resist the fire, as I have found by experience ; but the safe may not be so strong or durable, though somewhat cheaper.

" The above composition or preparation of gypsum may be mixed with several other articles not contrary to its nature, with a view to increase its efficacy in resisting the action of fire; but from my experience I doubt if they have much effect. The gypsum alone, when properly prepared, and properly placed in the space left to receive it, and made to fill it completely, is quite sufficient to resist, for a long space of time, the most intense heat. The chemical properties of this article are such, that, by the application of intense heat, it imparts a vapor or gas, or some other properties, which effectually stay the progress of the fire, and arrest the influence and effects of the heat; this I have ascertained by various experiments; and I believe I am the first man that discovered the utility, and devised the method of applying gypsum, or plaster of Paris, to increase the safety of an iron chest. I am not aware that this article was ever used for the purposes above set forth, until I used it in the manner above described.

" I therefore claim, as my discovery and invention and improvement, the application and use of plaster of Paris, or gypsum, in its raw state, or prepared as above, either alone or with mica, in the construction of all iron chests or safes, in the manner above described, or in any other manner substantially the same.

DANIEL FITZGERALD,

" Witnesses : — G. H. PATTERSON,
BEVERLEY R. HENSON, jr."

It was also averred in the declaration, that before the date of said letters patent, to wit, on the 7th day of April, 1839, the said Daniel Fitzgerald made an assignment, which was duly recorded in the Patent-Office of the United States, on the 1st day of June, 1839, as follows : —

Gayler et al. *v.* Wilder.

" Whereas I, Daniel Fitzgerald, of the city, county, and State of New York, have invented certain improvements in safes, which invention I call the ' Salamander safe,' for which I am about to make application for letters patent of the United States: And whereas E. Wilder, of New York aforesaid, has agreed to purchase from me all right, and title, and interest which I have, or may have, in and to the said invention, in consequence of the grant, of letters patent therefor, and has paid to me, the said Fitzgerald, the sum of five thousand dollars, the receipt whereof is hereby acknowledged:

" Now, this indenture witnesseth, that, for and in consideration of the said sum to me paid, I have assigned and transferred to E. Wilder aforesaid the full and exclusive right to all the improvements made by me, as fully set forth and described in the specification which I have prepared and executed preparatory to obtaining letters patent therefor. And I hereby authorize and request the Commissioner of Patents to issue the said letters patent to the said E. Wilder and his legal representatives.

" In testimony whereof, I have hereunto set my hand, and affixed my seal, this 11th day of April, 1839.

DANIEL FITZGERALD. [SEAL.]

" Witnesses : — OWEN G. WARREN,
CHARLES H. FOSTER."

The declaration then proceeded as follows : —

" And the said plaintiff further saith, that the said Enos Wilder, in his lifetime, after the making of the said assignment by the said Daniel Fitzgerald to the said Enos Wilder, as afore mentioned, and before the committing of the several grievances hereinafter mentioned, to wit, on the first day of September, in the year of our Lord 1843, and within the Southern District of New York aforesaid, did execute a certain instrument or agreement to the said plaintiff, whereby the said Enos Wilder, in consideration of the agreement made with the said plaintiff, and of one dollar to him, the said Enos Wilder, in hand paid by the said plaintiff, bargained, sold, conveyed, and assigned to the said plaintiff all the right, title, and interest of him, the said Enos Wilder, in and unto the patent granted to the said Daniel Fitzgerald, for an improvement in fire-proof safes and chests, by the use of prepared gypsum, dated June 1, 1843 ; and of which patent he, the said Enos Wilder, was the sole owner and assignee, as will appear by the records of the Patent-Office ; and which patent he, the said Enos Wilder, had good right to sell and convey to the said plaintiff, to be by him, the said plaintiff, held as his own property, free from all

claims from the said Enos Wilder, or any one claiming under him, the said Enos Wilder, as by the said instrument or agreement, sealed with the seal of the said Enos Wilder, ready in court to be produced, will, reference thereunto being had, fully and at large appear."

This last-mentioned instrument was averred to have been recorded in the Patent-Office of the United States on the 10th day of October, 1843.

It was then averred, that, by virtue of the last-mentioned instrument, plaintiff became, and ever since hath been, sole owner of said improvement, &c., yet, the defendants well knowing, &c.

The defendants pleaded the general issue, and gave notice that they would offer evidence that Daniel Fitzgerald was not the first and original inventor of the improvement patented.

The bill of exceptions was as follows : —

BENJAMIN G. WILDER *v.* CHARLES J. GAYLER AND LEONARD BROWN.

Be it remembered that, on the trial of the aforesaid issue, the plaintiff, to maintain the same, after having read said patent in evidence as set forth in the declaration, read the following conveyance and agreement, which was duly recorded, and a copy of which was, at the date of said patent, indorsed on the same, viz. : —

[Here was inserted the conveyance from Fitzgerald to Enos Wilder of the 11th of April, 1839, already set out in full in the declaration.]

And thereupon the defendants insisted that said instrument did not convey the legal title of said patent to the said Enos Wilder, and that, upon such conveyance, he could not have brought a suit on the same; but said court decided that said instrument operated to convey the interest in said patent to said Enos Wilder, so that, during his life, he could have maintained an action at law on the same; to which opinion of said court the counsel for the defendants then and there excepted.

### 1st Exception.

And the plaintiff then read the conveyance from said Enos Wilder to him, as stated in his said declaration, which he insisted made out a right in him to sustain his aforesaid action; but the defendants, to show that, after the date of the conveyance to the plaintiff, and before he commenced this action, he made, executed, and delivered to Silas C. Herring, Esq., the following agreement and conveyance, namely : —

" Benjamin G. Wilder agrees with Silas C. Herring to grant to him the sole and exclusive right to make the safe, called the

Salamander safe, according to the terms and upon the plan pointed out and described in the patent and specification of Daniel Fitzgerald, which patent is dated June 1, 1843, and was assigned to Enos Wilder, and by him to Benjamin G. Wilder, who now owns the same; and this license is to be for the city, county, and State of New York; and said Herring is to have and enjoy the full and exclusive right to make and vend said safes in the city, county, and State of New York, and nowhere else; the said Herring is to have the same for the residue of the unexpired term of said patent, with all the improvements which may be made in the manufacture of said safes which said B. G. Wilder may have a right to use during said term; and said Herring agrees that said Wilder may use all the improvements which he may make, or have a right to use, during said term. In consideration whereof, said Herring agrees with said Benjamin G. Wilder to pay to him, for the use of the right aforesaid, one cent a pound for each and every pound said safes may weigh when finished and sold; which sum is to be paid monthly so long as said patent remains in full force, and until the same has been set aside by the highest court of the United States to which the same may be carried; but said Herring agrees to pay the one cent a pound for the space of two years, at all events, and whether said patent shall be declared good or not. If sustained, then said Herring is to pay as aforesaid for the full term as aforesaid. All the safes so made and sold by said Herring are to have said Wilder's patent marked thereon, the same as heretofore, in a plate, or cast in letters, ' Wilder's patent safe.' Said Herring agrees to keep an accurate account of all the safes by him made, or caused to be made, under said contract and patent, with the weight of each when sold, and the names of the persons to whom sold, and their places of abode, and to render said account monthly, if so often called on for it, and to pay accordingly. Said Herring is to manufacture all the safes he may sell, or offer to sell, under and according to said patent, with such improvements as he may have a right to use, and be marked as above with the words, in large, legible letters, ' Wilder's patent safe.' Said Wilder reserves to himself the right to manufacture, in this city and State of New York, or elsewhere, safes to sell out of this State and city; but if sold within this State or city, then said Wilder is to pay said Herring one cent a pound on each safe so made and sold within this city or State. Said Wilder is not himself to set up or establish, nor authorize any one else to set up and establish, any manufactory or works for making Salamander safes, or safes similar to said Salamander safes, at any place within fifty miles of this city. Said

Herring is to make all safes like Wilder's, and not vary in any substantial part therefrom, with such improvements as may be added.

" In presence of
    S. P. STAPLES,
      *Witness to both signatures.*

           *"New York, January 6th,* 1844.

" If said patent should not be decided to be good till the end of three years, then for the time over the two years, till decided good, said Herring pays nothing. It is further understood and agreed, that all safes made by said Herring, or in the making of which, or the selling thereof, he shall in any way be directly or indirectly concerned, consisting of a double case or box with the intermediate space filled with plaster or any non-conducting substance, shall be considered within this agreement, and be paid accordingly.         B. G. WILDER,
               SILAS C. HERRING."

" (Received and recorded 30th January, 1844.) "

### *2d Exception.*

And thereupon the defendants insisted that the plaintiff had parted with all his interest in said patent by virtue of said agreement, so that he could not sustain his aforesaid action. But said court decided that the plaintiff had not, in and by said agreement, so far parted with his interest in said patent as to deprive him of the right to sustain his aforesaid action ; to which opinion of said court the defendants did then and there except.

### *3d Exception.*

And the defendants then and there objected, that the invention and improvement, set forth and claimed in said patent as the invention of the patentee, was not the subject of a patent; that it was the mere application of an old, well-known material to a new purpose, which they insisted could not be the subject of a patent. But said court overruled said objection, and instructed the jury as herein set forth ; to which, as well as to the said instructions to said jury, the defendants excepted.

And the plaintiff, to maintain his aforesaid issue, called sundry witnesses to prove, and claimed that he had proved, that he made the discovery which was the foundation of his invention and improvement as early as some time in the year 1830 ; that he made experiments in various ways, to test the utility of his discovery and improvement, at different times, in the different years from 1830 to 1836, when he applied for his

patent; and that he pursued with due diligence that application until he obtained his aforesaid patent; and that the delay which had arisen in obtaining said patent was not caused by the fault or negligence of the patentee, or his assignee, Enos Wilder, nor any one else, but arose from the burning of the Patent-Office, and other causes not under the control of the applicants for the patent; and that the defendants had infringed said patent, as set forth in said declaration.

And the defendants introduced evidence to prove, and claimed that they had proved, that said Daniel Fitzgerald was not the first and original inventor of what he claimed in said patent as his improvement. Among other witnesses, James Conner testified, that, between 1829 and 1832, he was engaged in business as a stereotype founder, and, knowing that plaster of Paris was a non-conductor of heat, he constructed a safe with a double chest, and filled the space between the inner and outer one with plaster of Paris, — the same, substantially, as testified to and claimed by Fitzgerald, except there was no plaster used on the top of the safe. It was made for his own private use in his establishment, and was used by him as a safe from the time it was made till 1838, when it passed into other hands. It was kept in his counting-room while he used it, and known to the persons working in the foundery.

This testimony was confirmed by his brother, John Conner, except that he fixes the time of constructing the safe in the year 1831 or 1832. But one safe was made by Conner, and since it passed out of his hands he has used others of a different construction.

The defendants also claimed that, if said Daniel Fitzgerald was the first and original inventor of said improvement, as he claimed, yet that he had made said iron safes, and sold them, under such circumstances as that he had thereby abandoned the same, and suffered the same to go into public use in such manner as to lose all right to said invention and improvement, if any he ever had.

And the court thereupon instructed the jury that, if they found that Daniel Fitzgerald, the patentee, was the first and original inventor of the said improvement claimed in said patent, and that the use of plaster of Paris, in combination with and in the construction of an iron safe, is new and useful, as in the specification of said patent is set forth and claimed, then they would find that the patent was valid, and protected the invention and improvement as claimed, unless the plaintiff, or those under whom he claimed, had abandoned said improvement to the public, and suffered the same to go into public use before the application for said patent, of which facts the jurors were the judges.

And said court further instructed said jury, that if they found that the use made by James Conner of plaster of Paris was confined to a single iron chest, made for his own private use after said Fitzgerald's discovery and experiments, then it was not in the way of Fitzgerald's patent, and the same was valid; but if the jury found that said James Conner made his said safe, as claimed, and tested it by experiments before Fitzgerald's invention and improvement, and before he tested the same, then said Fitzgerald was not the first inventor, as claimed, and was not entitled to said patent.

The court further charged, that, independently of these considerations, there was another view of the case, as it respected the Conner safe: that it was a question whether the use of it by him had been such as would prevent another inventor from taking out a patent; that if Conner had not made his discovery public, but had used it simply for his own private purpose, and it had been finally forgotten or abandoned such a discovery and use would be no obstacle to the taking out of a patent by Fitzgerald, or those claiming under him, if he be an original, though not the first, inventor or discoverer of the improvement.

### 4th Exception.

And said court, in summing up said case to said jury, further instructed them, that if they found that Daniel Fitzgerald was the first and original inventor of said improvement, as set forth in said patent, and had not abandoned or dedicated the same to the public, but had, with reasonable diligence, pursued his invention till he had perfected the same, and used due diligence in applying for, and in pursuing his application for a patent, until he obtained the same, and if they found the defendants had made and sold safes, as charged in the plaintiff's declaration, then they would find their verdict for the plaintiff for such actual damages as they judged just and reasonable; but if they found otherwise, then they would find for the defendants. To each and all of these instructions given to the jury, the counsel for the defendants excepted.

And forasmuch as the facts aforesaid, and the decisions of the court thereon, do not appear of record, the defendants pray that this their bill of exceptions may be allowed.

Filed 23d Febuary, 1848.

S. NELSON. [SEAL.]

The cause was argued by *Mr. Cuyler,* for the plaintiffs in error, and by *Mr. Staples* and *Mr. Webster,* for the defendant in error.

41 *

*Mr. Cuyler*, for plaintiffs in error.

1. The second error assigned is, that the learned judge erred in ruling that the conveyance of April 11th, 1839, by Fitzgerald to Enos Wilder, of the invention for which he was about to seek a patent, operated to convey said patent to Enos Wilder, so that in his lifetime he could have maintained thereon an action in his own name.

This conveyance is dated April 11th, 1839. The patent did not issue until 1843, and then it issued to Fitzgerald, the inventor, and not to Enos Wilder, the transferree.

It will be readily conceded that the right of an assignee to sue in his own name must, if it exist, be *statutory.* But no section of any patent law in force bestows this right upon the assignee of an improvement about to be patented, such as was Enos Wilder.

The act of 1793 says, every " *invention* " shall be assignable. The eleventh section of the act of 1836 provides that " every patent shall be assignable in law," etc. It speaks of the " exclusive right under any patent," and of " the thing patented." Yet here there was no patent. The assignment is of an improvement intended to be patented. The patent did not exist until four years afterwards, and then it issued to the inventor, and not to the assignee of the improvement.

The sixth section of the act of 1837 provides for this very case, by permitting the issuing of the patent in such cases directly to the assignee of the improvement. Which should have been, but was not, done in this instance.

As no statute, therefore, creates a right in the assignee of an unpatented improvement to sue in his own name, it is submitted that Enos Wilder was an equitable, but not a legal, holder of the title to this patent, and that the learned judge erred in his ruling on this point.

2. The third error assigned is, " that the learned judge erred in ruling that the agreement of B. G. Wilder and Silas C. Herring, dated January 6, 1844, did not divest the said B. G. Wilder of all his interest in the patent, so far as the State of New York was concerned, and that the plaintiff could thereafter maintain his action."

By its terms, it expressly divests the plaintiff, for the remainder of the time of the patent, of all interest in said patent, so far as the city, county, and State of New York are concerned, and imposes upon the plaintiff a penalty to prevent the exercise of any rights by him under said patent in that State.

How, then, can damage be alleged, where the right said to be invaded has no existence? Or rather, how can the plaintiff

Gayler et al. *v.* Wilder.

suffer damage by the invasion of a right, the whole property in which has been passed by him to another ?

The hardship of this doctrine will be more apparent when it is considered that, if the plaintiff recover, the defendants will not be thereby exonerated from liability to Herring, the local assignee, but may be held accountable to him, and thus be compelled to pay these very damages a second time to another party.

There can be no damage without an injury done to some right possessed by the plaintiff. But here the plaintiff possesses no right. How, then, can he be damaged?

By this agreement, the advantages and profits of the patent in the city and State of New York are the property of Herring; and yet, if the plaintiff recover damages in this action, he will indirectly take to himself those profits, and thus contravene his own agreement. Herbert *v.* Adams, 4 Mason, 15 ; Park *v.* Little, 3 Wash. C. C. 196, 197.

3. The fifth and sixth errors assigned have relation to the instruction given by the learned judge with regard to the Conner safe.

It is submitted that, by the requirements of the patent law, the patentee must be not only *an* original inventor, but *the* original inventor, and that the patent will in all cases be defeated by proof of a prior invention.

It is especially urged that, even if the doctrine of the learned judge, in his charge, were correct, it is inapplicable to a case where the invention had been for eight years in open, notorious public use by the prior inventor at his counting-house, accessible to those in his employ, and then, at the expiration of eight years, and still before even an application for plaintiff's patent had been made, had passed into the possession of others.

It is submitted that this is not such a use as leaves it in any respect " a question whether the use made by Conner of the safe constructed by him had been such as would prevent another from taking out a patent."

The patent law of 1836, § 6, gives its privileges to an inventor whose invention was " not known or used by others before his discovery."

It exacts an oath from an inventor to this effect.

This safe, if Conner's invention be prior, was both known and used before, and nowhere in the act can there be found any qualifying words upon such knowledge or use, or any reservation of circumstances under which prior knowledge and use will not, if proven, defeat a patent.

The following authorities are in point, premising that the language of the patent act of 1793, in relation to the novelty

of the invention, is the same as that employed in the act of 1836, namely, " not known or used before."

" The plaintiff cannot object to the originality or priority and use of another machine, alleged to have been similar to his own, on the ground that it had gone into disuse, or was not *notoriously* in use ; since it is essential to his case to prove he was *the* original inventor of the machine for which he has a patent." Evans *v.* Hettick, 3 Wash. C. C. 408.

Under the sixth section of the patent law, if the thing secured by patent had been in use, or had been described in a public work anterior to the supposed discovery, the patent is void, whether the patentee had a knowledge of this previous use or not. Evans *v.* Eaton, 3 Wheat. 454.

If the original inventor of a machine abandons the use of it, and does not take out a patent for it, no other person can entitle himself to a patent for it. Evans *v.* Eaton, 1 Pet. C. C. 323.

In an action for a violation of a patent granted by the United States for an alleged original invention, the plaintiff must satisfy the jury that he was the original inventor in relation to every part of the world.

Although no proof was made that the patentee knew that the discovery had been made prior to his, still he could not recover, if, in fact, he was not the original inventor. Dawson *v.* Follen, 2 Wash. C. C. 311 ; Reutgen *v.* Kanowrs, 1 Wash. C. C. 168 ; Whitney *v.* Emmett, 1 Bald. 303. Also, Curtis on Patents, § 40, note.

The same construction of the act of Congress is given by Judge Story, in Reed *v.* Cutter, 1 Story, 590.

After ruling that the applicant must be not only *an* original inventor, but *the* original inventor, he says : " And it is of no consequence whether the invention is extensively known and used, or whether the knowledge and use thereof is limited to a few persons, or even to the first inventor himself, or is kept a secret by him."

And again : " The language of the patent act of 1836, p. 357, § 6, *not known or used,* &c., does not require that the invention should be known or used by more than one person, but merely indicates that the use should be by some other person than the patentee."

And again : " The decision in Dolland's case may be a correct exposition of the English statute of monopolies (21 James I.), but is not applicable to the patent law of the United States."

4. But there is another view of the case from this point, which is entitled to consideration.

It is submitted that, measured by the seventh section of the act of 1839, the construction and use of the Conner safe had been such as necessarily and absolutely to defeat the plaintiff's patent, and that the learned judge erred in not thus instructing the jury (5th, 6th, and 7th exceptions).

That section provides, —

"That every person or corporation who has, or shall have, purchased or constructed any newly invented machine, manufacture, or composition of matter, prior to the application by the inventor or discoverer for a patent, shall be held to possess the right to use, and vend to others to be used, the specific machine, manufacture, or composition of matter so made or purchased, without liability therefor to the inventor, or to any other person interested in such invention ; and no patent shall be held to be invalid by reason of such purchase, sale, or use prior to the application for a patent as aforesaid, except on proof of abandonment of such invention to the public ; or that such purchase, sale, or prior use has been for more than two years prior to such application for a patent."

In this section the words "newly invented machine, manufacture, or composition of matter" have been decided by this court to be synonymous with "invention or thing patented." McClurg *v.* Kingsland, 1 Howard, 202.

Now it is the distinct and uncontradicted fact, that in this case the invention or thing patented had been "constructed," and was in use by another, at least eight years before the application for a patent. And yet, by the final clause of the section just quoted, if there is proved such use, "two years prior to the application for a patent," such "patent shall be held to be invalid."

It is stated by one witness, that between the years 1829 and 1832, and by another, that in the year 1831 or 1832, Conner made a safe constructed precisely as is the patented safe, — that it was used as the safe for his establishment, — was kept in his counting-room, and was known to the persons working in his foundery, — and so continued to be until 1838, when it passed from Conner's into other hands.

The plaintiff's application for a patent bears date April 11th, 1839.

It is submitted, therefore, that this patent cannot be sustained without flatly contravening the clear and express language of the seventh section of the act of 1839, just quoted.

This case is one in which a recovery by the plaintiff below cannot be sustained without imposing great hardships upon the defendants. The patent issued in 1843, — more than four years after application for it was made, and more than thir-

teen years after the applicant had perfected his invention. The very same invention had been made by a stranger at least thirteen, and perhaps fourteen, years before the date of the patent, and had been publicly used by him, with the knowledge of many, for eight years before plaintiff's application for a patent, and had then passed from him into the hands of others.

Such a use for two years, by the seventh section of the act of 1839, defeats a patent.

Added to this, it was in evidence that the plaintiff no longer possessed the right for the invasion of which this action was brought, and the recovery, if had, must be for an injury done, not to him, but to another, — in whom the very same cause of action will continue to exist.

*Mr. Staples, contra.*

1. The first question is, whether the conveyance from Fitzgerald to Enos Wilder, before the issuing of the patent, conveyed the patent itself when issued. The error on the other side is in considering an invention as a sort of chose in action. An invention, however, is as much property as a horse or a house, and when patented becomes the *exclusive* property of the patentee. It is consequently assignable as well before as after the granting of letters patent. The very terms employed in the 11th and 14th sections of the act of 1836 (5 Stat. at Large, 121, 122), and which are relied on by the other side as showing that the *patent* only was assignable, show, on the contrary, that reference was not had to any thing in the nature of a chose in action, but that the *interest* of the inventor in the thing invented was the subject of assignment. Herbert *v.* Adams, 4 Mason, 15, is to the effect that a conveyance of an invention operates as a conveyance of the patent, whether dated before or after the patent. So also Curtis on Patents, §§ 189, 260.

2. The next assignment of error is, that the court did not decide that the agreement of the plaintiff with Silas C. Herring did not divest the former of all interest in the patent, so that he could not thereafter maintain an action thereon. We say not; because Wilder did not give up *all* his interest, he reserving one cent a pound on all safes made under the patent in the city and State of New York; because he reserved the right to manufacture in the city of New York on the terms named; because the agreement was a mere license; and because it is obvious, from the face of the agreement itself, that Wilder was to bring suits to sustain the patent. Brooks *v.* Byam, 2 Story, 541. The latter part of the agreement with Wilder was equivalent to this, viz.: Wilder sells to Herring the right to manufacture and vend safes within the city, county, and State of

New York. But he reserves to himself the right to make *in* the city safes to be sold *out* of the city. He also reserves the right to make safes to be sold *within* the city, upon payment to Herring of one cent per pound. This shows that Wilder had not sold his entire right, and could therefore maintain this action.

3. As to the Conner safe. The object of the law was to protect genius and at the same time to invite something useful to the country. A prior experiment, locked up in a man's own bosom, not divulged to the public, not rendered useful to the public, is surely not such an invention as will exclude a *bonâ fide* inventor of the same thing from the benefits of the patent laws, if he has used diligence in embodying his invention and reducing it to practice. Such, on the contrary, was the very person intended to be benefited. It is not correct to say that an inventor must have been the first man who has ever thought of the subject, or that mere speculations are within the meaning of the act; but he is an inventor under the law who has first put the invention into such a shape as to be useful to the public.

*Mr. Webster*, on the same side.

It is agreed that, under the previously existing laws, the invention would have been assignable. But it is supposed that the act of 1836, which repeals all former laws, only makes the patent assignable, but says nothing of the invention. Now two things are to be considered. 1st. In a country where the principle of the patent laws is recognized, where an *invention* is regarded as property which may be set apart for a person's own exclusive use, is it not assignable, independent of any statute enactment? If not, *why* is it not? What is the *reason* that an invention which is recognized as *property* shall not be transferrible, like other property, there being nothing in the statute to prohibit it? 2d. Does the language of the eleventh section of the act of 1836 restrict assignability to the patent? I think not. Every other portion of the act has a different aspect.

Wilder has clearly the right to maintain an action, for the reason that he has not parted with all his interest. He still has an interest to the value of one cent per pound. But the agreement itself was a mere license. It uses the term *license*, and does not run to the heirs and assignees.

With regard to the Conner safe, it could not be considered such a prior invention as would take away the right of Fitzgerald to a patent. There are *dicta* in Judge Story's decision in the case of Reed *v.* Cutter, which, if not limited, would be

of dangerous tendency. Now the instruction objected to supposes an invention to be made, but kept within the inventor's own bosom. The question is, whether an original inventor (that is, one who did not derive his knowledge from another), who has put his invention into practice, shall be deprived of his patent by such a mere thought, gendered in another's brain, and to which he " gives no *tongue*." The object of the patent law, and of the Constitution under which the law was passed, was the public benefit. If this be so, how does a man bring himself within its provisions who locks his secret in his own breast? And why is he less a benefactor to the public who invents a machine which had been before invented and afterwards forgotten, than he who invents something never before known?

*Mr. Cuyler*, in reply and conclusion.

It is said that the invention would be assignable, independent of the patent law. It is submitted that this is not correct. Except by statute, the inventor has no right of property in his invention. The statute was intended to confer that very right. Now the act of 1793 gave the right of assigning an *invention*, and yet, with this before them, Congress, in the act of 1836, make only the *patent* assignable. If, then, the patent is made assignable only by the law, how can it be said that the invention does not stand in need of such a provision?

It is said that the plaintiff has reserved one cent per pound, and can therefore maintain this action. It will be seen, however, that this part of the agreement is a penalty. If he, Wilder, makes safes in New York to be sold in New York, he shall pay, &c. A license can maintain an action.

The facts as to the Conner safe should have been left to the jury. This was not a case where the invention had been lost or forgotten; but within a few years a man makes for his own use, and actually uses in his own counting-house, a safe constructed upon the same principles as that which is the foundation of this suit. The law requires that a patented article should not have been made or used before.

Mr. Chief Justice TANEY delivered the opinion of the court.

Three objections have been taken to the instructions given by the Circuit Court at the trial, and neither of them is, perhaps, entirely free from difficulty.

The first question arises upon the assignment of Fitzgerald to Enos Wilder. The assignment was made and recorded in the Patent-Office before the patent issued. It afterwards issued to Fitzgerald. And the plaintiffs in error insist that this

assignment did not convey to Wilder the legal right to the monopoly subsequently conferred by the patent, and that the plaintiff, who claims under him, cannot therefore maintain this action.

The inventor of a new and useful improvement certainly has no exclusive right to it, until he obtains a patent. This right is created by the patent, and no suit can be maintained by the inventor against any one for using it before the patent is issued. But the discoverer of a new and useful improvement is vested by law with an inchoate right to its exclusive use, which he may perfect and make absolute by proceeding in the manner which the law requires. Fitzgerald possessed this inchoate right at the time of the assignment. The discovery had been made, and the specification prepared to obtain a patent. And it appears by the language of the assignment, that it was intended to operate upon the perfect legal title which Fitzgerald then had a lawful right to obtain, as well as upon the imperfect and inchoate interest which he actually possessed. The assignment requests that the patent may issue to the assignee. And there would seem to be no sound reason for defeating the intention of the parties by restraining the assignment to the latter interest, and compelling them to execute another transfer, unless the act of Congress makes it necessary. The court think it does not. The act of 1836 declares that every patent shall be assignable in law, and that the assignment must be in writing, and recorded within the time specified. But the thing to be assigned is not the mere parchment on which the grant is written. It is the monopoly which the grant confers : the right of property which it creates. And when the party has acquired an inchoate right to it, and the power to make that right perfect and absolute at his pleasure, the assignment of his whole interest, whether executed before or after the patent issued, is equally within the provisions of the act of Congress.

And we are the less disposed to give it a different construction, because no purpose of justice would be answered by it, and the one we now give was the received construction of the act of 1793, in several of the circuits; and there is no material difference in this respect between the two acts. As long ago as 1825, it was held by Mr. Justice Story, that in a case of this kind an action could not be maintained in the name of the patentee, but must be brought by the assignee. 4 Mason, 15. We understand the same rule has prevailed in other circuits ; and if it were now changed, it might produce much injustice to assignees who have relied on such assignments, and defeat pending suits brought upon the faith

of long established judicial practice and judicial decision. Fitzgerald sets up no claim against the assignment, and to require another to complete the transfer would be mere form. We do not think the act of Congress requires it; but that, when the patent issued to him, the legal right to the monopoly and property it created was, by operation of the assignment then on record, vested in Enos Wilder.

The next question is upon the agreement between the defendant in error and Herring. Is this instrument an assignment to Herring for the State or city of New York, upon which he might have sued in his own name? If it is, then this action cannot be maintained by the defendant in error.

Now the monopoly granted to the patentee is for one entire thing; it is the exclusive right of making, using, and vending to others to be used, the improvement he has invented, and for which the patent is granted. The monopoly did not exist at common law, and the rights, therefore, which may be exercised under it cannot be regulated by the rules of the common law. It is created by the act of Congress; and no rights can be acquired in it unless authorized by statute, and in the manner the statute prescribes.

By the eleventh section of the act of 1836, the patentee may assign his whole interest, or an undivided part of it. But if he assigns a part under this section it must be an undivided portion of his entire interest under the patent, placing the assignee upon an equal footing with himself for the part assigned. Upon such an assignment, the patentee and his assignees become joint owners of the whole interest secured by the patent, according to the respective proportions which the assignment creates.

By the fourteenth section, the patentee may assign his exclusive right within and throughout a specified part of the United States, and upon such an assignment the assignee may sue in his own name for an infringement of his rights. But in order to enable him to sue, the assignment must undoubtedly convey to him the entire and unqualified monopoly which the patentee held in the territory specified, — excluding the patentee himself, as well as others. And any assignment short of this is a mere license. For it was obviously not the intention of the legislature to permit several monopolies to be made out of one, and divided among different persons within the same limits. Such a division would inevitably lead to fraudulent impositions upon persons who desired to purchase the use of the improvement, and would subject a party who, under a mistake as to his rights, used the invention without authority, to be harassed

by a multiplicity of suits instead of one, and to successive recoveries of damages by different persons holding different portions of the patent right in the same place. Unquestionably, a contract for the purchase of any portion of the patent right may be good as between the parties as a license, and enforced as such in the courts of justice. But the legal right in the monopoly remains in the patentee, and he alone can maintain an action against a third party who commits an infringement upon it. This is the view taken of the subject in the case of Blanchard *v.* Eldridge, J. W. Wallace, 337, and we think it the true one.

Applying these principles to the case before us, the action was properly brought by the plaintiff below, and could not have been maintained by Herring.

The agreement is singularly confused and complicated. It purports to grant to Herring the exclusive right to make and vend the Salamander safe in the city, county, and State of New York; and Herring agrees to pay to the defendant in error a cent a pound for every pound the safes might weigh, to be paid monthly. But at the same time it reserves to Wilder the right to set up a manufactory or works for making these safes in the State of New York, provided it is not within fifty miles of the city, and to sell them in the State of New York, paying to Herring a cent a pound on each safe so sold within the State.

It is evident that this agreement is not an assignment of an undivided interest in the whole patent, nor the assignment of an exclusive right to the entire monopoly in the State or city of New York. It is therefore to be regarded as a license only, and under the act of Congress does not enable Herring to maintain an action for an infringement of the patent right. The defendant in error continues the legal owner of the monopoly created by the patent.

The remaining question is upon the validity of the patent on which the suit was brought.

It appears that James Conner, who carried on the business of a stereotype founder in the city of New York, made a safe for his own use between the years 1829 and 1832, for the protection of his papers against fire; and continued to use it until 1838, when it passed into other hands. It was kept in his counting-room and known to the persons engaged in the foundery; and after it passed out of his hands, he used others of a different construction.

It does not appear what became of this safe afterwards. And there is nothing in the testimony from which it can be inferred that its mode of construction was known to the person into whose possession it fell, or that any value was attached

to it as a place of security for papers against fire; or that it was ever used for that purpose.

Upon these facts the court instructed the jury, "that if Conner had not made his discovery public, but had used it simply for his own private purpose, and it had been finally forgotten or abandoned, such a discovery and use would be no obstacle to the taking out of a patent by Fitzgerald or those claiming under him, if he be an original, though not the first, inventor or discoverer."

The instruction assumes that the jury might find from the evidence that Conner's safe was substantially the same with that of Fitzgerald, and also prior in time. And if the fact was so, the question then was whether the patentee was "the original and first inventor or discoverer," within the meaning of the act of Congress.

The act of 1836, ch. 357, § 6, authorizes a patent where the party has discovered or invented a new and useful improvement, "not known or used by others before his discovery or invention." And the 15th section provides that, if it appears on the trial of an action brought for the infringement of a patent that the patentee "was not the original and first inventor or discoverer of the thing patented," the verdict shall be for the defendant.

Upon a literal construction of these particular words, the patentee in this case certainly was not the original and first inventor or discoverer, if the Conner safe was the same with his, and preceded his discovery.

But we do not think that this construction would carry into effect the intention of the legislature. It is not by detached words and phrases that a statute ought to be expounded. The whole act must be taken together, and a fair interpretation given to it, neither extending nor restricting it beyond the legitimate import of its language, and its obvious policy and object. And in the 15th section, after making the provision above mentioned, there is a further provision, that, if it shall appear that the patentee at the time of his application for the patent believed himself to be the first inventor, the patent shall not be void on account of the invention or discovery having been known or used in any foreign country, it not appearing that it had been before patented or described in any printed publication.

In the case thus provided for, the party who invents is not strictly speaking the first and original inventor. The law assumes that the improvement may have been known and used before his discovery. Yet his patent is valid if he discovered it by the efforts of his own genius, and believed himself to be

the original inventor. The clause in question qualifies the words before used, and shows that by knowledge and use the legislature meant knowledge and use existing in a manner accessible to the public. If the foreign invention had been printed or patented, it was already given to the world and open to the people of this country, as well as of others, upon reasonable inquiry. They would therefore derive no advantage from the invention here. It would confer no benefit upon the community, and the inventor therefore is not considered to be entitled to the reward. But if the foreign discovery is not patented, nor described in any printed publication, it might be known and used in remote places for ages, and the people of this country be unable to profit by it. The means of obtaining knowledge would not be within their reach; and, as far as their interest is concerned, it would be the same thing as if the improvement had never been discovered. It is the inventor here that brings it to them, and places it in their possession. And as he does this by the effort of his own genius, the law regards him as the first and original inventor, and protects his patent, although the improvement had in fact been invented before, and used by others.

So, too, as to the lost arts. It is well known that centuries ago discoveries were made in certain arts the fruits of which have come down to us, but the means by which the work was accomplished are at this day unknown. The knowledge has been lost for ages. Yet it would hardly be doubted, if any one now discovered an art thus lost, and it was a useful improvement, that, upon a fair construction of the act of Congress, he would be entitled to a patent. Yet he would not literally be the first and original inventor. But he would be the first to confer on the public the benefit of the invention. He would discover what is unknown, and communicate knowledge which the public had not the means of obtaining without his invention.

Upon the same principle and upon the same rule of construction, we think that Fitzgerald must be regarded as the first and original inventor of the safe in question. The case as to this point admits, that, although Conner's safe had been kept and used for years, yet no test had been applied to it, and its capacity for resisting heat was not known; there was no evidence to show that any particular value was attached to it after it passed from his possession, or that it was ever afterwards used as a place of security for papers; and it appeared that he himself did not attempt to make another like the one he is supposed to have invented, but used a different one. And upon this state of the evidence the court put it to the jury to say, whether this safe

42 *

had been finally forgotten or abandoned before Fitzgerald's invention, and whether he was the original inventor of the safe for which he obtained the patent; directing them, if they found these two facts, that their verdict must be for the plaintiff. We think there is no error in this instruction. For if the Conner safe had passed away from the memory of Conner himself, and of those who had seen it, and the safe itself had disappeared, the knowledge of the improvement was as completely lost as if it had never been discovered. The public could derive no benefit from it until it was discovered by another inventor. And if Fitzgerald made his discovery by his own efforts, without any knowledge of Conner's, he invented an improvement that was then new, and at that time unknown; and it was not the less new and unknown because Conner's safe was recalled to his memory by the success of Fitzgerald's.

We do not understand the Circuit Court to have said that the omission of Conner to try the value of his safe by proper tests would deprive it of its priority; nor his omission to bring it into public use. He might have omitted both, and also abandoned its use, and been ignorant of the extent of its value; yet, if it was the same with Fitzgerald's, the latter would not upon such grounds be entitled to a patent, provided Conner's safe and its mode of construction were still in the memory of Conner before they were recalled by Fitzgerald's patent.

The circumstances above mentioned, referred to in the opinion of the Circuit Court, appear to have been introduced as evidence tending to prove that the Conner safe might have been finally forgotten, and upon which this hypothetical instruction was given. Whether this evidence was sufficient for that purpose or not, was a question for the jury, and the court left it to them. And if the jury found the fact to be so, and that Fitzgerald again discovered it, we regard him as standing upon the same ground with the discoverer of a lost art, or an unpatented and unpublished foreign invention, and like him entitled to a patent. For there was no existing and living knowledge of this improvement, or of its former use, at the time he made the discovery. And whatever benefit any individual may derive from it in the safety of his papers, he owes entirely to the genius and exertions of Fitzgerald.

Upon the whole, therefore, we think there is no error in the opinion of the Circuit Court, and the judgment is therefore affirmed.

Mr. Justice McLEAN.

I dissent from the opinion of a majority of the judges in this case. The point of difference, I think, is essential to the maintenance of the rights of the public and also of inventors.

It was proved by James Conner, as appears from the bill of exceptions, " that between 1829 and 1832 he was engaged in business as a stereotype founder, and, knowing that plaster of Paris was a non-conductor of heat, he constructed a safe with a double chest, and filled the space between the inner and outer one with plaster of Paris ; the same, substantially, as testified to and claimed by Fitzgerald, except there was no plaster used on the top of the safe. It was made for his own private use in his establishment, and was used by him as a safe from the time it was made till 1838, when it passed into other hands. It was kept in the counting-room while he used it, and was known to the persons working in the foundery." This evidence was confirmed by another witness.

By the sixth section of the patent act of 1836, it is provided, " that any person or persons having discovered or invented any new or useful art, machine, manufacture, or composition of matter, or any new or useful improvement on any art, machine, manufacture, or composition of matter, *not known or used by others before his or their discovery or invention thereof*," may apply for a patent, &c. The applicant is required to " *make oath or affirmation that he does verily believe that he is the original and first inventor*," &c., " *and that he does not know or believe that the same was ever before known or used.*"

The seventh section authorizes and requires the Commissioner of Patents " to make or cause to be made an examination of the alleged new invention or discovery ; and if on such examination it shall not appear to the Commissioner that the same had been *invented or discovered by any other person in this country prior to the alleged invention or discovery thereof by the applicant, or that it had been patented or described in any printed publication in this or any foreign country,*" &c., the Commissioner may grant a patent.

In the fifteenth section it is provided, " that whenever it shall satisfactorily appear that the patentee, at the time of making his application for the patent, believed himself to be the first inventor or discoverer of the thing patented, the same shall not be held to be void on account of the invention or discovery, or any part thereof, having been before known or used *in any foreign country*, it not appearing that the same or any substantial part thereof had before been patented or described in any printed publication."

From the above extracts, it is seen that the patentee must be the inventor of the machine, or the improvement of it, or he can have no right. If the thing was known or used by others, he cannot claim a patent. Or if it was patented in a foreign country, or described in any publication at home or in any

foreign country, he has no right to a patent. To this there is only the exception in the fifteenth section above cited. But this can have no influence in the present case.

Let these provisions of the statute be compared with the two last paragraphs of the charge of the court, as stated in the third exception : —

" And said court further instructed the jury, that if they found that the use made by James Conner of plaster of Paris was confined to a single iron chest, made for his own private use after said Fitzgerald's discovery and experiments, then it was not in the way of Fitzgerald's patent, and the same was valid ; but if the jury found that said James Conner made his said safe, as claimed, *and tested it by experiments*, before Fitzgerald's invention and improvement, *and before he tested the same*, then said Fitzgerald was not the first inventor, as claimed, and was not entitled to said patent."

This charge stands disconnected with any other facts in the case, except those named, and, in my judgment, it is erroneous. If Conner's safe were identical with Fitzgerald's, and though it was of prior invention, *yet if it were not tested by experiments* before Fitzgerald's improvement, and before he tested the same, the jury under the instruction were bound to find for Fitzgerald. And the case was thus made to turn, not on the priority of invention only, but upon that *and the fact of its having been tested by experiments*. This introduces a new principle into the patent law. The right under the law depends upon the time of the invention. An experimental test may show the value of the thing invented, but it is no part of the invention.

" The court further charged, that, independently of these considerations, there was another view of the case, as it respected the Conner safe ; that it was a question whether the use of it by him had been such as would prevent another inventor from taking out a patent ; that if Conner had not made his discovery public, but had used it simply for his own private purpose, and it had been finally forgotten or abandoned, such a discovery and use would be no obstacle to the taking out of a patent by Fitzgerald, or those claiming under him, if he be an original, though not the first, inventor or discoverer of the improvement."

If there be any thing clear in the patent law, it is that the original inventor means the first inventor, subject only to the provision stated in the fifteenth section. This instruction presupposes that the safes are the same in principle. Now, if the invention was patented abroad, or was described in a foreign publication, both of which were unknown to the inventor in

this country, still his patent is void.  So it is void if such invention has been known to any person in this country.  The instruction says, if Conner's invention " had been forgotten or abandoned," it was no obstacle to Fitzgerald's right.  Can a thing be forgotten or abandoned that was never known?  If known before Fitzgerald's invention, it is fatal to it.  By whom must it have been forgotten?  By the inventor, or the public, or both?  And how must it have been abandoned?  When an invention is abandoned, it is said to be given up to the public, and this is the sense in which the term *abandonment* is used in the patent law.  Such an abandonment would be fatal to the right of Fitzgerald.

Conner's safe, as appears from the bill of exceptions, was used in his counting-house, being accessible to every one, some six or eight years.  In 1838 it passed into other hands; but into whose hands it does not appear.  In 1843, Fitzgerald obtained his patent.  How long before that he made experiments to test the invention is not proved.  At most, the time must have been less than five years.  This is a short period on which to found a presumption of forgetfulness.  The law authorizes no such presumption.  It can never become the law.  It is not founded on probability or reason.  The question is, Was Conner's invention prior to that of Fitzgerald?  That it was of older date by some ten or twelve years is proved.  And the instruction, it must be observed, was founded on the supposition that both inventions were similar.

The instruction seems to attach great importance to the fact that Conner's safe was used only for his private purpose.  This is of no importance.  The invention is the question, and not the manner in which the inventor used it.  The safe was constructed at the foundery, and must have been known to the hands there employed.  How can it be ascertained that Fitzgerald was not informed by some of these hands of the structure of Conner's safe, or by some one of the many hundreds who had seen it in his counting-house in the city of New York?  It was to guard against this, which is rarely if ever susceptible of proof, that the act is express, — *if the thing patented was known before,* the patent is void.  If the fact of this knowledge in any one be established, it is immaterial whether the patentee may have known it or *not,* it avoids his patent.

The law, on this subject, is not founded upon any supposed notions of equity.  A foreign patent for the same thing, or a description of the thing in a foreign publication, is as effectual to avoid the patent as if the patentee had seen the prior invention.  Notice to him is not important.  The law is adopted on

a settled public policy, which, while it is just to inventors, protects the rights of the public. Any other basis would open the door for endless frauds, by pretended inventors, without the probability of detection. And. especially does this new doctrine of forgetfulness, or abandonment, used in any other sense than as recognized in the patent law, leaving such matters to a jury, overturn what I consider to be the settled law on this subject. Of the same character is the fact, that the invention was used for private purposes. A thing may be used in that way, and at the same time be public, as was the case with the Conner safe, and yet the jury are necessarily misled by such an instruction.

Mr. Justice DANIEL, dissenting.

Differing from the majority in the decision just pronounced, I proceed to state the grounds on which my dissent from that decision is founded.

On two essential points in this cause, it seems to me that the learned justice who tried it at the Circuit has erred, and that the decision here should therefore have been for a reversal of his judgment. Those points involve, first, the right of the plaintiff below to maintain his action upon the title or right of action deduced from Fitzgerald through Enos and Benjamin Wilder; and secondly, a right to or interest in the subject of the suit on the part of the plaintiff below, admitting that subject to have been originally invented and used by some other person than Fitzgerald; a right founded upon an assumption that this subject had been used in *private only*, or had, in the language of the learned justice, been " finally forgotten or abandoned " by such first inventor. These points are presented by the first and third exceptions of the plaintiffs in error to the rulings at the trial below. The plaintiff in the Circuit Court claimed by assignment from B. G. Wilder, assignee of Enos Wilder, assignee of Daniel Fitzgerald, alleged to have been the inventor of the Salamander safe. By the paper deduction of title, it appears that, on the 11th day of April, 1839, Fitzgerald, alleging that he had invented an improvement called the Salamander safe, for which he was about to apply for letters patent, for the consideration of five thousand dollars, sold the interest he then had, or might thereafter have, in this invention, to Enos Wilder; that Enos Wilder, on the 1st day of September, 1843, for the consideration of one dollar, assigned and transferred to the plaintiff all the right, title, and interest which he had derived from Fitzgerald, under the agreement of the 11th of April, 1839; that no patent issued for this Salamander safe until the year 1843, when a patent was granted to *Daniel Fitz-*

*gerald,* as the original inventor; that no patent for this invention has ever been granted either to Enos or B. G. Wilder, either as inventor or assignee of this safe; that the title, whatever it may be, rests upon the agreement between Fitzgerald and Enos Wilder, of the 11th of April, 1839, before the patent to the former.

It must be recollected, that this is an action *at law;* and in order to maintain it, the plaintiff was bound to set out and to prove *a legal title.* Has he done either? What was the character of the interest or title transferred from Fitzgerald to Enos Wilder? This could not transcend the interest or title possessed by Fitzgerald himself; and what was this? A title to any specific machine which he may have constructed, and of which no person could rightfully deprive him; and a claim upon the good-will and gratitude of the community, if in truth he should have conferred upon them a benefit by the discovery and construction of his machine. I speak now in reference to rights derivable from the common law; and independently of the Constitution or of statutory provisions. The mere circumstances of inventing and constructing a machine could no more inhibit its imitation, than would the structure or interior arrangement of a house of peculiar ingenuity or convenience prevent the like imitation by any one who could possess himself of its plan. The mere mental process of devising an invention enters not into the nature of property according to the common law; it forms no class or division in any of its enumerations or definitions of estates or property, and is a matter quite too shadowy for the practical character of that sturdy system.

A doctrine contrary to this, though with some discrepancy amongst the judges as to its extent, seems at one time to have obtained in the King's Bench, as propounded in the case of Millar *v.* Taylor, in 4 Burrow, 2305, in opposition to the profound and unanswerable reasoning of Mr. Justice Yates; but upon a review of the same question in the Lords, in the case of Donaldsons *v.* Becket and others, the doctrine of the King's Bench was repudiated, and that of the common law, as asserted by Yates, Justice, vindicated and restored. And, indeed, if, according to the opinions of some of the judges in the case of Millar *v.* Taylor, the mere mental process of invention constituted an estate or property at the common law, and property vested *in perpetuo,* except so far as it should be transferred by the owner, it is difficult to perceive the necessity of a cautious and complicated system for the investment and security of interests already perfect, and surrounded with every guard and protection which is inseparable under the

common law from every right it has created or recognized. But if the mere mental and invisible process of invention, apart from the specific, sensible, and individual structure, can be classed at all as property at law, it must partake of the character of a chose in action, much more so than an obligation or contract, the terms and conditions of which are defined and assented to by the contracting parties. To choses in action, it can scarcely be necessary here to remark, assignability is imparted by statutory enactment only, or by commercial usage. To hold that the single circumstance of invention creates an estate or property at law, and an estate and legal title transmissible by assignment, appears to me a doctrine not merely subversive of the common law, but one which contravenes the origin and course of legislation in England in relation to patent rights, and renders useless and futile both the constitutional provision and all the careful enactments of Congress for the security and transmissibility of the same rights. For why, as has been already remarked, should that provision and these enactments have been made for the establishment and security of that which was established and safe independently of both? I hold it, then, to be true, that the circumstance of *invention* invests no such perfect estate or right of property as can be claimed and enforced at law or in equity against the *user* of the same invention, either by subsequent inventors or imitators, and that any estate or property in the mere mental process of invention must be traced to and deducible from the Constitution and the acts of Congress alone. I cannot but regard as mischievous and alarming an attempt to introduce a *quasi* and indefinite, indefinable, and invisible estate, independently of the Constitution and acts of Congress, and unknown to the rules and principles of the common law.

It is the *patent alone* which creates an estate or interest in the *invention* known to the law, and which can be enforced either at law or in equity, either by the inventor or by the person to whom, by *virtue of the statute*, he may assign his rights. Down to the act of Congress of 1837, nothing but the estate, interest, or property created or invested by *the patent itself*, was made assignable. The language of the law is, that "*every patent*," "*the exclusive right under any patent*," "*the thing patented*," may be assignable. The fact or existence of *a patent* is in every instance inseparable from the right given. It is this fact and this only which impresses the quality of assignability. Of course, under these provisions there could be no transfer of the legal title previously to a patent.

By section sixth of the act of Congress approved March

3d, 1837, it is provided·that *thereafter* any patent *to be issued* may be made to the assignee of the inventor or discoverer, upon the conditions set forth in that section. Yet still it is presumed that, until the issuing of a patent, so far is it from being·true that a legal estate or title existed in such assignee, it is clear, on the contrary, that no *legal title* existed before the patent in the inventor himself, for it is the patent which constitutes his title. · Of course, then, the assignee can at most hold nothing but an equity under such an assignment, which he may insist upon under this assignment against·the inventor or against the government; but he has no legal title by force merely of such an assignment, and *a fortiori* he has no legal title, if the patent, notwithstanding such an assignment, is in fact issued to the inventor, but is thereby entirely excluded from all pretension to a legal title. Thus, in the case before us, the patent under which the plaintiff claims was, subsequently to the agreement between Fitzgerald and Enos Wilder, issued to Fitzgerald, the inventor, and, according to the proofs in the cause, has never been renewed to Enos Wilder, nor to any claimant under him, nor been assigned to any such claimant, but remains still in the alleged inventor, Fitzgerald. It seems to me, then, indisputable, that the legal title indispensable for the maintenance of this suit *at law* never was in the plaintiff, and that he could not maintain the action.

The second instance in which I hold the learned justice who tried this cause to have erred is that in which he instructed the jury as follows : — " That if Conner had not made his *discovery public,* but had used it simply for his own private purpose, and it had been *finally forgotten or abandoned,* such *discovery* and *use* would be no obstacle to the taking out of a patent by Fitzgerald, or those claiming under him, if he be an original, though not *the first, inventor or· discoverer* of the improvement." In considering this instruction of the learned judge, the first vice with which it appears to be affected is its violation of a rule thought to be universally applicable to instructions to juries in trials at law; and that rule is this, that instructions should always arise out of, and be limited to, the facts or the evidence in the cause to which the questions of law propounded from the bench should be strictly applicable; and that instructions which are general, abstract, or not springing from, and pertinent to, the facts of the case, are calculated to mislead the jury, and are therefore improper. Tried by this rule, the instruction of the learned judge, so far as it relates to Conner's not having made his discovery *public,* or having finally forgotten or abandoned it, is certainly irrelevant to and unsustained by, any evidence in the record. So far is the

existence of such testimony from being shown, the converse is proved and is justly inferrible throughout; for although it does not appear that Conner advertised his invention in the public papers, or claimed a patent for it, it is admitted that he used this safe in an extensive business establishment, to which it is certain from the nature of his business the public had access; and it is not pretended that he made any effort at concealment of what he had invented, and the record is entirely destitute of evidence of an abandonment of his invention. As to the assumption of his having forgotten it, there is neither a fact, an inquiry, nor conjecture in the testimony pointing to such a conclusion. The instruction appears to me to be wholly gratuitous and irrelevant. But supposing this instruction to have been founded upon testimony introduced before the jury, let us consider for a moment its correctness as a rule of law applicable to this cause. This charge, it must be recollected, admits that Conner was, or might have been, the first inventor; and, notwithstanding, asserts that Fitzgerald, though posterior in time, might, upon the conditions and considerations assumed by the judge, become the owner of the right. Are these conditions warranted, either by the rules of public policy, or by the terms and language of legislative provisions on such subjects? It is said that patent privileges are allowed as incitements to inventions and improvements by which the public may be benefited. This position, that may be conceded in general, should not be made a means of preventing the great and public purposes its legitimate enforcement is calculated to secure. The admission of this principle leaves entirely open the inquiries, whether he is more the benefactor of the public who makes a useful improvement which he generously shares with his fellow-citizens, or he who studies some device which he denies to all, and limits by every means in his power to a lucrative monopoly; and still more, whether the latter shall be permitted to seize upon that which had already (as is here admitted) been given to the public, thereby to levy contributions, not only on the community at large, but upon him, even who had been its generous benefactor. It was doubtless to prevent consequences like those here presented, that the *priority* and *originality* of inventions are so uniformly and explicitly insisted upon in all the legislation of Congress, as will presently be shown. The tendency of the learned judge's charge to mislead the jury, from its want of precision, and its failure to define any certain predicament upon which the action of the jury should be founded, is of itself an insuperable objection to that charge. Thus it is said, if Conner " had not *made his discovery public.*" In what mode? it may be asked. What form of publicity did

Gayler et al. *v.* Wilder.

the learned judge intend the jury should require? It is shown that Conner used his safe publicly; that is, he concealed it from no one; and if any mode or kind of publication or concealment was requisite, either to establish or conclude the right of Conner, or to conclude common right (a delinquency in the nature of a forfeiture), surely that mode, if found either in any statute, or in the rules of the common law, ought to have been clearly laid down, so as to guard the rights of all. In the next place, it is said by the learned judge, that, if Conner had *abandoned* this improvement which the charge admits him to have invented, this would justify a patent to another who had not known of the improvement, although a subsequent inventor. I have always understood it to be indisputable law, that wherever an inventor abandons or surrenders an invention or improvement which he has certainly made, and neither claims an exclusive right in himself nor transfers it to another, the invention or improvement is given to the public; but by the charge in this case, such an abandonment transfers *an exclusive right* to one who, by the case supposed, *is admitted not to be the first inventor.* So, too, with respect to the hypothesis of the learned judge that the invention had, or might have, been forgotten. To this the same objections of vagueness and uncertainty, and the graver objection of injustice to the real inventor, or to the public, are applicable. By whom and for what interval of time must this improvement have been forgotten, in order to transfer it from the originator thereof? For a term of years? And if so, for how long a term? But suppose he forgets it for his lifetime, shall his executor or his posterity, upon the exhibition of indisputable proofs of the invention, yea, the very machine itself, perfect in all its parts and in its operation, be cut off? This surely cannot be; but, at any rate, the jury should have been furnished with some rule or measure of obliviousness, if this was to be made the substantive cause of deprivation as to the original inventor, or the foundation of right and of exclusive right in one confessedly not the first inventor. An attempt has been made to compare the doctrine propounded by the court to what it might be thought is the law as applicable to the discovery, or rather *recovery*, of the processes employed in what have been called *the lost arts.* This illustration is in itself somewhat equivocal, and by no means satisfactory; for if that process could certainly be *shown* to be the same with one claimed by the modern inventor, his discovery could scarcely have the merit of originality, or be the foundation of exclusive right. But, in truth, the illustration attempted to be drawn from a revival of a lost art is not apposite to the present case. The term *lost art* is applicable pecu-

liarly to certain monuments of antiquity still remaining in the world, the process of whose accomplishment has been lost for centuries, has been irretrievably swept from the earth, with every vestige of the archives or records of the nations with whom those arts existed, and the origin or even the identity of which process none can certainly establish. And if a means of producing the effect we see and have amongst us be discovered, and none can either by history or tradition refer to a similar or to the identical process, the inventor of that means may so far claim the merit of originality, though the work itself may have been produced possibly by the same means. But not one principle drawn from such a state of things can be applied to a recent proceeding, which counts from its origin scarcely a period of fifteen years. In fine, this ruling of the learned judge is regarded as being at war not less with the policy and objects than it is with the express language of all the legislation by Congress upon the subject of patent rights, which legislation has uniformly constituted *priority of invention* to be the foundation and the test of all such rights. Thus in the act of April 10th, 1790, the first patent law, (1 Stat. at Large, 109,) it is declared by the first section, " That upon the application of any person or persons, &c., setting forth that he, she, or they hath or have invented or discovered any useful art, &c., *not before known or used*," &c.; and the second section of the same statute, requiring a specification of any invention or discovery, declares that it shall be so described " as to distinguish it from all other things known or used."

The act of February 21st, 1793, (1 Stat. at Large, 318,) provides, that when any citizen or citizens of the United States shall allege that he or they have invented any " *new and useful art*, &c., *not known or used before the application*," &c.

By the act of April 17th, 1800, (2 Stat. at Large, 38,) which extends the privilege of patents to aliens, proof is required that the art, invention, or discovery hath not *been known or used* in that or any foreign country. It is true that this requisition has been so far relaxed as to admit of the patenting in this country inventions which had been invented and used abroad, but with respect to this country the invention, &c. must still be original.

In the act of July 4th, 1836, (5 Stat. at Large, 117,) reorganizing the Patent-Office, the language of the sixth section is as follows: " That any person or persons having discovered or invented any new and useful art, &c., *not known or used by others before his or their discovery*," &c. The language and import of the laws here cited are too plain to require comment,

and I think that the production of a single instance from the statute-book may safely be challenged by which the requisites above mentioned have been dispensed with. Every law, on the contrary, has emphatically demanded originality and priority as indispensable prerequisites to patent privileges, and every aspirant to such privileges is expressly required to swear to these prerequisites, as well as to establish them. These tests ordained by the laws are not only founded upon the true reason for the privileges conferred, but they are simple and comprehensible; whereas the innovations permitted by the ruling of the learned judge not only conflict with the true reason and foundation of patent privileges, but tend to an uncertainty and confusion which cannot but invite litigation and mischief. I think that the judgment of the Circuit Court should be reversed, and the cause remanded for a *venire facias de novo.*

Mr. Justice GRIER also dissented.

### *Order.*

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages at the rate of six per centum per annum.