## AJAX METAL CO. v. BRADY BRASS CO.

(Circuit Court, D. New Jersey. July 31, 1907.)

1. PATENTS—INVENTION—SUBSTITUTION OF MATERIALS.
   While the substitution of one material for another is not as a rule patentable, there are exceptions to such rule, and, under some circumstances, the adaptation of certain materials either singly or in combination to the production of certain desired results may amount to invention, even though it involves no more than the taking advantage of certain inherent qualities developed or discovered experimentally. This is particularly the case with respect to composite mixtures or alloys of metals.

2. SAME—VALIDITY AND INFRINGEMENT—ALLOY FOR JOURNAL BEARINGS.
   The Hendrickson and Clamer patent, No. 655,402, for an alloy for anti-friction bearings, which consists of a copper tin-lead alloy, having "less than seven per cent. of tin and more than twenty per cent. of lead and the balance of copper," covers a superior alloy for journal bearings, having a higher percentage of lead, which is the lubricant, than it was previously thought possible to make successfully. It discloses invention, and is not void for anticipation nor lack of novelty, nor because of prior knowledge and use of the invention. Nor is it invalid for indefiniteness, in that it specifies only the maximum limit of tin and the minimum limit of lead in the alloy, it having been discovered by the patentees by experiment that within such limits, a critical relation exists between the metals, whereby, on being fused together, the copper-tin matrix, which holds the lead in suspension, solidifies quickly at a high temperature, and retains properly distributed through it, before it has time to run off or settle, a

greater quantity of the lead (which solidifies at a still lower temperature) than when other proportions are used, and the description, therefore, gives a practical working formula to those skilled in the art, and is as definite as it can be made and protect the invention. Neither is the advance made in the art one of degree merely; the alloy made within the proportional limits given being sharply and critically different from those not so made. The patent also *held* infringed.

**3. SAME—NOVELTY—PRIOR USE.**

In order that a single prior knowledge and use of an invention may be enough to negative novelty in a subsequent patent therefor, it must be something more than an accidental or casual use, and it must be shown that such use was so far appreciated at the time and adopted or followed as to create a well-understood, if not an established, practice capable at any time of being resorted to, and not something incidental and fugitive which is hunted up and brought forward simply to defeat the patent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 66.]

**4. SAME—PROOF TO ESTABLISH PRIOR USE.**

The temptation in patent cases to resort to the defense of prior use to defeat the patent is always great, and parties are held in consequence to the most convincing and stringent proof, not only to the fact of such use, but to its character as well.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 78.]

In Equity. Bill to restrain infringement of letters patent No. 655,-402, issued to Joseph G. Hendrickson and Guilliam H. Clamer, for an alloy for anti-friction bearings. On final hearing.

Augustus B. Stoughton, for complainant.
Hillary C. Messimer, for defendant.

ARCHBALD, District Judge.[1] The mere substitution of one material for another is not, as a rule, patentable. Hotchkiss v. Greenwood, 11 How. 248, 13 L. Ed. 683. Brown v. District of Columbia, 130 U. S. 87, 9 Sup. Ct. 437, 32 L. Ed. 863. But to this there are exceptions. And, while it may not be possible to define just when it is so, it must be recognized that, under some circumstances, the adaptation of certain materials, singly or in combination, to the production of certain desired results, may amount to invention; and that too, even though it involves no more than the taking advantage of certain inherent qualities, developed or discovered experimentally. Smith v. Goodyear Dental Co., 93 U. S. 486, 23 L. Ed. 952; Goodyear Dental Vulcanite Co. v. Davis, 102 U. S. 222, 26 L. Ed. 149; Magowan v. New York Belting Co., 141 U. S. 332, 12 Sup. Ct. 71, 35 L. Ed. 781; Potts v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, 39 L. Ed. 275. This is particularly the case with regard to composite mixtures or alloys of metals, such as is the character of the device in suit, the object of which, as declared by the inventors, was to provide an anti-friction alloy for journal bearings, which should hold up within itself more lead than was theretofore considered possible.

The value of alloys, composed of tin, lead, and copper, for the bearings of railroad cars and engines, had long been recognized, but up to 1892 there had been no attempt at any definite mixture; old brass and copper scrap and shells, of heterogeneous character, being somewhat indiscriminately made use of. About that time, however, as the out-

[1] Specially assigned.

come of an extended line of experiments, it was determined by Dr. C. B. Dudley, the eminent head of the chemical department of the Pennsylvania Railroad (whom it gives me pleasure to say I have known for nearly 40 years), that the best results were to be obtained from an alloy, consisting approximately of 8 per cent. of tin, 15 per cent. of lead, and the rest of copper. The lead in such a mixture is the lubricant, the tin gives hardness, and the copper strength. Too much tin, however, increases the wear, producing a hard, cutting, action, besides adding to the expense, while with lead it is just the opposite, so that upon both grounds it is desirable, within certain limits, to keep down the tin and increase the lead as much as possible. But lead does not unite with the others chemically, and hence a certain amount of tin is necessary, the copper and tin forming a skeleton frame or matrix of a honeycomb structure, in which the lead is held mechanically, and the problem is to determine just the right proportions. The practical difficulty experienced with a copper-tin-lead mixture is that, in the process of melting, a so-called eutectic or readily fusing alloy between the copper and tin is formed, as a subsidiary compound, which solidifies at a comparatively low temperature, allowing the lead with a still lower melting point to segregate and fall to the bottom, when present in quantity, producing what is known as a "lead sweat." To obviate this, a high solidifying point for the mass is requisite, at which the copper-tin matrix shall set quickly and hold the lead properly distributed through it, before it has time to run off or settle; and with this secured an indefinite increase of lead is possible.

The received idea, however, at the date of the patent, as the result of the Dudley experiments, was that the limit in the diminution of tin and increase of lead had been reached in the relative amounts there determined; the proportion of tin so fixed being supposedly required to hold up the lead, and tin and lead having to be increased together beyond that. But it was discovered by the present inventors that this was not the case, and that, on the contrary, the subject was regulated by a critical relation between the metals involved, by which, with tin at less than 7 per cent. by weight, lead at more than 20 per cent. and the balance, or some 73 per cent., of copper, there was a quick solidification of the mass without the forming of any appreciable eutectic alloy, the large percentage of lead present being held and retained without difficulty, a small percentage of other metals, such as antimony, zinc, iron, etc., to be found in ordinary brass scrap as impurities, being also permitted. The proportions so given, it is to be observed, conform to a critical point in the constitution of copper-tin alloys, on one side of which, according to the relative percentages employed, they solidify or set quickly at a high temperature; and, on the other, by reason of different percentages, they combine differently, forming among other subsidiary compounds certain eutectic mixtures, which remain liquid for a much longer period, cooling slowly. This critical point is a well demonstrated scientific fact, which is generally, if not universally, accepted; and is shown to exist close to where there are 9 parts of tin to 91 of copper, or relatively something over 9 per cent. of the former. Having regard to this, and the consequences which flow from it when lead is additionally intro-

duced, all tin-copper-lead alloys divide sharply into those which contain this relative proportion of tin and copper, which, by reason of their high melting point and the absence of eutectic alloys, permit of a large content of lead, and those which fall outside of these limits, where this is not possible. The adaptation of this principle in the production of anti-friction alloys for railroad bearings constitutes the merit of the present invention and the contribution made by it to the journal-bearing art. Its utility has been most signally recognized; the Pennsylvania Railroad having adopted and made large and increasing use of the alloy for a number of years, at first with the addition of a little nickel, which was supposed to produce a more homogeneous mixture, but latterly without it. And, upon certain bearings sent out from the Pittsburg shops for use on the lines west of there having been found to infringe, the company on notice desisted. It is also in use on the extensive system of the Norfolk & Western Railroad. And, upon being submitted to Mr. Robert J. Fisher, counsel for the Eastern Railway Association, the companies composing that association were advised to respect the patent, the practical significance of which will be appreciated. The proportions specified in the single claim of the patent are "less than 7 per cent. of tin, and more than 20 per cent. of lead, and the balance of copper." But these amounts are to a certain extent suggestive only, and are not strictly adhered to in practice; the most satisfactory results for high grade bearings being secured with an alloy of 5 per cent. of tin, 30 per cent. of lead, and 65 per cent. of copper, a variation which the patent permits and was intended to cover. This, with a small fraction of sulphur, which is of no materiality, is the combination made use of by the defendants, who thus admittedly infringe, if the patent is valid.

The validity of the patent, however, is contested upon several grounds. And the first criticism of it is its indefiniteness. The limitation of tin, as it is said, is given but one way, "less than 7 per cent.," and of lead, the other, "more than 20 per cent."; the copper being dependent upon both and varying accordingly. There is nothing certain about this, as it is claimed, admitting of almost endless variety, as it does, and affording no real guide. But that it presents a practical working formula, according to the evidence, there can be no doubt. To one skilled in the art, as is there shown, it teaches that, with tin not exceeding the limit named, lead to the extent of 20 per cent. and upwards can be incorporated—a desirable feature if it could be accomplished as is well known—the proportion of copper being regulated to correspond. By observing these limits, the mixture is kept within the critical point necessary for the avoidance of eutectic alloys and the formation of a homogeneous mass, so that, practically as well as scientifically considered, the directions are sufficiently precise and instructive. Anything more so would admit of evasion and give away the invention, which consists not in the establishment of exact and rigid proportions, but in the discovery and disclosure of the critical relation between tin and copper, required to make possible a high percentage of lead, the terms of the patent being so framed as to appropriate and cover the whole field, copper-tin-lead alloys, as pointed out above, being divided into those where this is possible and those where it is not. Within

the limits so fixed, it is left to the particular person practicing the invention to determine the proportions which he deems best, the patent simply but explicitly instructing him to keep down his tin below 7 per cent., whereby lead to exceed 20 per cent. may be successfully introduced. It is not to be assumed that, in doing so, ordinary skill and judgment will not be exercised, this being presupposed; or that the extreme and manifestly useless combinations, suggested in argument as possible, will be pursued.

It is said, however, that by the nickel patents to the same inventors, issued within three weeks after the application for the patent in suit and there referred to, they are on record as declaring that, not only was tin as low as 6 per cent. possible, but that, by the use of a small amount of nickel not exceeding 1 per cent., the tin could be reduced to three per cent. or even be entirely dispensed with, the lead at the same time being increased, as a desirable feature, as high as 22 per cent., thus in both respects realizing the terms of the patent. But that the desirability of a high per cent. of lead is so suggested is of no significance. This was well known, the difficulty being to accomplish it. Nor does the low per cent. of tin, which is shown in the same connection, bring the case within the patent; this being brought about by the use of the nickel, the declared purpose of the patent in suit being to produce the same result of high lead and low tin without that constituent, the inventors having apparently discovered the ability to do so, while the applications for the nickel patents were pending.

Much stress is laid, however, on the fact that Dr. Dudley, in his Franklin Institute address in 1892, not only disclosed the desirability of increasing the lead and decreasing the tin, but, as productive of the best results attained by his experiments, gave definite percentages, not far removed from those of the patent, namely, 8 per cent. of tin, 15 per cent. of lead, and 77 per cent. of copper, at the same time suggesting that a further diminution of tin and increase of lead with still better results might be practicable. The advance made upon this, if any, by the present inventors, was thus, according to the argument, not only plainly marked out for them, but was at the best one of degree merely, which is not patentable, the alloy which they have devised having no different characteristics, physically or chemically, from that produced and described by Dr. Dudley. But, however close the proportions of the two may seem to be, those given by Dr. Dudley are in fact outside of the patent, and beyond the critical relation which is there disclosed and declared for. And while it is true that Dr. Dudley did suggest possibilities tending to a still further approach to it, intimating that the question had not perhaps been finally disposed of, his own experiments in that direction were not successful, leading him to the conclusion that the limit in all probability had been reached, and that, as one function of the tin was to hold up the lead, upon the lead being increased the tin had to be also, a mistake, shared by others, which impeded rather than promoted a discovery. Dr. Dudley also concedes that the successful production by these inventors of an alloy for railroad bearings, containing so little tin and so high lead, not theretofore deemed practicable, involved invention, although at an earlier stage, when less

fully informed, he was inclined to question it. And while this is by no means conclusive, and it is not, of. course, to be expected that, with becoming modesty, he would bespeak more for his own contribution to the art, however conspicuous, than it was entitled to, to the disparagement of others, he would certainly be the first to detect their shortcomings, and to appreciate whether the advance claimed was all that was said of it. Nor is it true that this advance was one of degree merely. The fact is, as stated by Dr. Sauveur, confirmed by Dr. Chandler, and already alluded to—which Prof. Langley and Prof. Richards, the defendants' experts, men of the highest professional standing, by the way, do not seem to deny—that alloys manufactured in accordance with the patent are sharply and critically different from those not so manufactured, the difference being one of kind, all tin-copper-lead alloys dividing into those which contain the relative proportions named in the patent, which, by reason of their high setting point and the absence of eutectic compounds, permit the introduction of a large quantum of lead, and those which fall outside of these limits, where it is not practicable. This does not present simply the case of a copper-tin-lead alloy, low in tin and high in lead, nor yet of a specially composed journal-bearing material. But it consists in the establishment of a precise rule or formula, by which within certain limits, to the extent desired, and without other than the ordinary foundry methods, a homogeneous mixture of this general character, known to be of the highest utility for the purpose, is capable of being successfully produced. Standing for this, as the patent clearly does, there is nothing in what is so sought to be urged against it which detracts from the merit or the validity of the invention.

Neither is there in the various anticipations charged. It is said, for instance, that a bronze coin of the Atilia family of the date of 45 B. C., an analysis of which was given in a work on mixed metals and metallic alloys, published by A. H. Hiorns in 1890, was made of a composition within the terms of the patent; there being 4.77 per cent. of tin, 25.43 per cent. of lead and 68.72 per cent. of copper. But an ancient coin is no guide for a modern railroad journal, and a disclosure with respect to the one teaches nothing of value as to the other. Conceding, therefore, that the analysis so published shows that an alloy of the character given could be successfully coined, it was not to be assumed that it could be made use of under the very different conditions which obtain in the case of a journal bearing.

It is further said that the Hahn (1873) British patent is for a copper-tin-lead alloy, which is suggested as suitable, among other things, for anti-friction bearings, the copper being stated at from 70 to 73 per cent., the tin from 9 to 11 per cent., and the lead from 15 to 20 per cent., with zinc from $\frac{1}{2}$ to 1 per cent. But on this there is no occasion to dwell. Not only is it outside of the proportions named in the patent and the critical relation upon which these are based, but it does not approach by a considerable so near as Dr. Dudley did, and, if his experiments did not anticipate, neither by so much the more does this.

The Vaughan (1874) British patent stands no differently. It too

is for an anti-friction bearing metal, in which tin, copper, and lead are the principal constituents, with a certain amount of phosphorus and zinc. It is of interest as advancing the theory, of which use is made in the patent in suit, as well as in all such mixtures, that, in the process of melting, alloys of the metals named are formed having different degrees of fusibility and solidifying at different temperatures, whereby a porous cellular mass of the harder and less fusible metals is produced, in which the softer and more easily melted are held, the interstices or cells of the one being filled with the others, presenting a soft-bearing surface for contact with the friction producing parts. But, outside of this, the disclosures of the patent are of little consequence. The proportion of tin suggested runs all the way from 4 to 15 per cent., and lead the same, varied by phosphorus and zinc, the latter being given at from 8 to 20 per cent., with enough copper added to it all to make up 100 parts, between which extremes the inventor does not seem to discriminate. All this to too wide of the mark to require discussion.

So, also, is the Hewitt (1901), besides which it is later in date than the patent in suit, from which time alone it takes effect as a publication. Bates v. Coe, 98 U. S. 31, 25 L. Ed. 68; Diamond Drill Co. v. Kelley (C. C.) 120 Fed. 282. And, even assuming that the date of the application, which is earlier, could be considered, it amounts to no more than the other patents referred to, if so much, it being doubtful, also, whether it states anything practicable.

This brings us to the real issue in the case, which is more serious—the alleged prior knowledge and use of the invention by the Brady Metal Company, with which Mr. Brady, the president of the defendant company, was formerly associated. The contention is that in April, 1896, some four years before the application for the present patent, the Brady Metal Company, which was an extensive manufacturer of railroad bearings, made a successful casting of substantially the same proportions of tin, lead, and copper, as are now practiced by the defendants within the terms of the patent, and continued to make use of the same from that time on, as have the Brady Brass Company succeeding them. This, if established, is, of course, the end of the patent, the novelty of which it effectively negatives. There can be no question, under the evidence, that at the date stated the Brady Metal Company did make a journal composed of copper, tin, and lead in the proportions suggested. This is proved by documentary evidence which cannot be controverted, the original letters from the metallurgical chemists who made the analysis having been produced, where the copper is given at 65.29 per cent., the tin at 7.54 per cent., and the lead at 26.56 per cent., with traces of zinc and iron which are not material, the percentage of tin being subsequently corrected and reduced to 5.93, by taking out the antimony which had been inadvertently included. But while a single previous knowledge or use, such as this, may be enough to negative novelty (Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821; Daniel v. Restein [C. C.] 131 Fed. 469), the use must be something more than an accidental or casual one (Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279). It must, indeed, be so far understood and practiced or persisted in as to become an established

fact, accessible to the public and contributing definitely to the sum of human knowledge. Gayler v. Wilder, 10 How. 477, 497, 13 L. Ed. 504; Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 Fed. 344. It is incumbent on the defendants, therefore, to show that the prior use which is set up was so far appreciated at the time, and adopted or followed, as to create a well-understood, if not an established, practice, capable at any time of being resorted to, and not something incidental, indefinite, and fugitive, which is now hunted up and brought forward simply for the purpose of defeating the patent. It is just here that the use by the Brady Metal Company, which is relied upon, is challenged, and is open to question. It is true that the requirements in this respect have apparently been met, if the statements of Mr. Brady, the president of the company, as well as of Mr. Reubens, his assistant, and Mr. Adams, the assistant superintendent, are taken broadly, as they are made, without discrimination. Mr. Brady, for instance, says, in substance, that for some time prior to April, 1896, they had been experimenting to get a cheap low-grade mixture that would be high in lead and low in tin, and that, upon the occasion in question, the particular bearing journal appearing to be so good, they thought it an excellent sample, and sent it to their chemists to be analyzed accordingly, and that, when it came back, "Eureka" would best express his feelings with regard to it; that he at once sent to Mr. Onslow, the superintendent of the works (now dead), for another piece; and that from then on bearings were produced and sold by them of substantially the proportions of tin, lead, and copper so shown, not exclusively, indeed, there being bearings made by them of different composition and character, and some under specific orders, but definitely, extensively, and continuously, so long as he was connected with the Brady Metal Company where this occurred, and afterwards with the Brady Brass Company, upon its organization.

But, comprehensive as this testimony may seem to be, upon examining it critically, it does not stand the test; its deficiencies not being disclosed in this résumé of it. The principal difficulty with it is that it deals in generalities, without much knowledge. Mr. Brady, as he has to admit, only knew in a broad way what was going on at the works, for which he had to rely on Mr. Onslow, the superintendent, his own office being elsewhere. That which they were striving for, as he says, was a cheap, low-grade bearing, such evidently as would satisfy the trade, and allow them to compete successfully with others, rather than one of any particular excellence. The piece sent to the chemists for analysis was not selected upon any such account as is stated by Mr. Brady, but, as is shown by the letter [2] to Mr. Onslow of April 13, 1896, ordering it, was produced for the express purpose of having a test, being made up, as directed, of 50 per cent. clean copper and 50 per cent. of copper shells, with whatever tin was deemed necessary. The object of the test is not disclosed, nor the considerations which controlled the mixture, but it was evidently to see how far copper shells would

[2] This letter was not put in evidence at the hearing before the examiner, but was produced by the defendants upon call by the court, and is treated as though it were regularly offered.

economically answer; the result which followed being regarded solely to that end. That this result was altogether haphazard and unexpected is shown, not only by the way it was brought about, but by the fact that, in his estimate of the contents of the copper shells, Mr. Onslow took them for 50 per cent. lead and 50 per cent. copper, when, by the analysis made at the same time with that of the journal, they were found to be 79.66 per cent. lead, as against 9.72 per cent. copper, the rest being tin and antimony, and it was because of this mistake that the relative percentages of tin and lead turned out as they did in the casting. This, of course, would not matter, provided the effect of these percentages was appreciated, and the proportions shown were adopted and followed. But clearly that was not the case. The journal analyzed was a single test piece of 19 pounds, of which Mr. Onslow, upon being applied to, could not furnish any more, not having saved any, and there was apparently no call upon him to reproduce it. That there was any change at the works in the mixture of these metals as a result of the showing made is not pretended. On the contrary, Mr. Brady says that they had been putting them together in about the same shape for a number of years, and simply continued on as they had been doing; the time assigned for this previous practice being anywhere from 10 to 15 years, carrying it back of even the Dudley experiments. It is difficult to understand, if this was the case, why he was particularly elated or moved to cry out "Eureka" as to a matter with which they had been so long acquainted. For the prior, as well as the subsequent, course at the works, however we have only the say-so of Mr. Brady and his assistants, no record being produced, nor any working practice shown; the men who weighed out and mixed the metals, as we shall presently see, who ought to be acquainted with it, if any one, knowing nothing about it. Mr. Brady also admits that no regard was paid to impurities in the shape of iron, zinc, etc., which were permitted as high on an average as 3 or 4 per cent., with a maximum at times of 8 or 10, which not only carries the practice outside of the patent, where only incidental or inappreciable impurities are allowed, but, as is shown by the evidence, with impurities in such quantity, commercial castings could not be made. It is thus evident that the chance proportions of tin and lead, shown by the analysis relied on, have simply been seized upon, because they happen to fall within the terms of the patent, in the hope that they may do duty as an instance of prior knowledge and use, without their having any such real character. In this respect Dr. Dudley's advice, in his letter of September, 1903, to look up their records, and see whether they would not show bearings containing over 20 per cent. lead and less than 7 per cent. tin, seems to have been effectively followed, and may have inspired this whole defense; suggesting a lack of independent knowledge on the subject outside of it. But, however that may be, no particular virtue was recognized in the mixture at the time, except as it might help to produce a cheap or low-grade bearing, and even now is stoutly denied; success, as it is claimed, residing in the manner of mixing and melting, which the defendants' workmen have achieved by experience and skill without regard to proportions. There was thus, as the outcome of the disclosure made by the analysis,

no modification of the practice previously pursued, no rule deduced for future guidance, no excellence of quality perceived, except as it made for cheapness. While, then, taking Mr. Brady's testimony at the best, and allowing all that can be fairly claimed for it, it may show that, upon the one occasion, by chance experiment, the terms of the patent were realized, and that to this extent and in this sense a prior use may have been established, there must be something more in order to satisfy the statute than that which was so purely accidental, unappreciated, ineffective, and impermanent.

Nor is this materially improved by the testimony of Mr. Reubens or Mr. Adams, which is not, of course, to be lost sight of. The knowledge of the former beyond that of Mr. Brady may be doubted. As assistant to the president, and his stenographer, he was no more likely to be acquainted with what was going on at the works than his superior. And while, as chemist, which he also seems to have been, he may have been in shape to make analyses, as well as to interpret them, there is nothing to prove that he ever did anything for the company in this line. He does say that he talked over with Mr. Onslow, from time to time, the percentages of tin and lead which were being used, and he is satisfied from this, as he says, and the one particular analysis which was made, that the directions for more lead and less tin were being followed. The statements of Mr. Onslow, as to what he was doing, are mere hearsay, and, of course, not evidence. But, accepting what passed between them in this way as indicative of what was desired and was being aimed at, it amounts to no more than that they were striving for as little tin and as much lead as was practicable, which may be conceded; that being the wish of every one. It is no proof, however, of the actual percentages successfully realized, and by the analyses made in July, 1896, of some of the products of these works by the same parties who made the earlier one in April, lead and tin are shown by no means within the proportions now claimed, to say nothing of the large per cent. of zinc present, thus proving that, notwithstanding the disclosure made by the first analysis, it had up to that time resulted in no confirmed knowledge or practice such as is set up, which naturally throws doubt as to any that followed.

It is true that in the testimony of Mr. Adams we apparently have something more specific. He was assistant superintendent under Mr. Onslow, and thus presumably acquainted with what was being done. And he states, positively and definitely, that at both the Brady Metal Company and the Brady Brass Company, where he was also employed as superintendent, as high as 30 per cent. of lead, and as low as 5 per cent. of tin, were successfully employed in making bearing alloys. But neither does this bear the requisite scrutiny. The only way that he can swear to it, as he says, is that upon one occasion he weighed out 30 pounds of lead himself and put it into the crucible. But, without holding him down to any such particularity, he admits that, as a matter of general practice, they were making use of composition scrap, consisting of copper shells, turnings, old oil cups, castings, "and such stuff," as much lead being put in as they could hold up. But this is just the indiscriminate way that every one else was

doing prior to the time of the invention, with correspondingly uncertain and unsatisfactory results, and nothing more definite or nearer to the patent could be looked for, from it, there than eleswhere. Adams is discredited also by his statements to James Heavey, who was sent to him by the complainants, upon learning that he was formerly connected with the Brady Metal Company. To Heavey he said, as the latter testifies, that he knew of no low mix of tin, and that the company never put in as high as 20 per cent. of lead, nor, indeed, more than 16 or 17 pounds to the pot (180 pounds), which is not half that. He also said that he had forgotten about it since he was out of the business. This was reported back to the complainants, who took steps to have him attend as a witness. But upon Heavey's going to him a second time, he said he was not an errand boy for the Ajax people, intimating that, if they wanted him, they ought to communicate with him directly. This they did by letter suggesting a specific date for his testimony, but got no answer. And on a third visit by Heavey he was even less cordial, and more offish, making a half promise to testify, but not keeping it. Heavey is charged with bias, having worked for the Brady Brass Company and been discharged after a few weeks' service. And it is no doubt true that, when Hopkins went to Adams, he told him substantially the same as he says now, that they got over 35 or 40 per cent. of lead in their mixtures. But, outside of this, his statements, as Hopkins says, were vague and rambling, and the impression left was that Adams wanted money, and was not to be relied upon. Without crediting that, however, all things considered, his testimony is not left in such a shape as to be unhesitatingly accepted.

Nor is this all that there is to be said upon this subject. When Brady and Reubens were on the witness stand, they were asked who there was who would confirm their statements with regard to the practice at the works, and the percentages of tin and lead which were made use of, and they both declared, without naming any one, that they would be known to some of the workmen. But in flat contradiction of this those of the workmen who would be likely to be informed, if any, upon being called by the complainants, professed that they knew nothing of any such practice as had been testified to. Mr. Wilmerding, for instance, went to work in the defendants' foundry in June, 1901, in order to familiarize himself with the various products of the company, so as to qualify as a salesman; and became acquainted, through foundry slips, with the component parts of the different mixtures, one of which slips he produced, together with a memorandum book in which the various formulas made use of at the time by the Brady Brass Company were entered, and, so far as his acquaintance went, the company, as he says, never made or sold a metal having more than 20 per cent. lead and less than 7 per cent. tin and the balance copper. Defendants say that he was only four weeks in the foundry, and but four or five months with the company all told. But, considering the object he had in view in going into the foundry, it is hardly credible that he would not have become informed of a bearing mixture of such superior quality.

John Stehr was also employed by the Brady Metal Company for five or six years, up to 1898; his duties being to receive the metals as they came from the dealers, and weigh the mixtures of copper, tin, and lead for supplying the furnaces, under the directions of the superintendent, there being but two such weighers, himself and another. There were definite proportions to these mixtures, as he says, some of which he gives, one, of the so-called Magnus metal, being composed of 15 pounds of lead, .15 pounds of tin, and 100 pounds of copper; and he says that he has no knowledge of any in which there was more than 20 per cent. lead, and less than 7 per cent. tin, the proportions of the patent. There was also a shell mixture composed of 60 to 70 pounds of copper and 35 to 40 pounds of shells, from which, as a rule, the castings were bad, the lead sweating out and more copper having to be added, besides which there were other compositions of scrap and brasses, which it would take too long to go into. The position which this man was in, and the necessary familiarity which he had to have because of it, make it altogether improbable that there could have been any mixture, low in tin and high in lead, without his knowledge, and his denial that there was is convincing. There certainly could be no steady run in daily practice of the character claimed, which would escape his notice while he was there, and this continued for two years after April, 1896, when it is said to have started.

Hermann Bunje also worked for the Brady Metal Company from 1892 to 1899, tending to the fires, and putting the metal into the pots to be melted down. The general specifications, as he says, called for 100 lbs. of copper, 15 of tin, and 15 of lead, which represented the common practice. There was also another mixture of 77 of copper, 13 of lead, and 10 of tin; but never anything of over 20 pounds of lead, with less than 7 pounds of tin, in a 100-pound mixture. There were besides this other make-ups, of turnings and old bearings or brasses, with the latter of which 15 or 20 pounds of shells—a bundle to a pot—were used, and sometimes sheet copper and shells. But this was in the old shop (which they left in the fall of 1896), and did not turn out well and was not continued steadily, the sheet and copper shells doing the best. James Heavey, an experienced molder, already spoken of, now working for the complainants, was also employed in the fall of 1899 by the Brady Brass Company, and he confirms the others that they did not while he was there use more than 15 per cent. of lead in their copper-tin-lead alloys, and did make use of the other mixtures which have been given. But he only worked there about four weeks, and his means of knowledge were correspondingly limited; the value of his testimony being thus in its corroboration of the others.

Summing up, therefore, the conclusions reached upon this branch of the case, both on account of the unsatisfactory character of the evidence produced by the defendants, as well as because of this direct contradiction of it, the alleged prior knowledge and use which is set up cannot be sustained. The temptation to resort to a defense of this kind in patent cases is always great, and parties are held in consequence to the most convincing and stringent proof. Deering v. Winona Harvester Works, 155 U. S. 286, 15 Sup. Ct. 118, 39 L. Ed. 153.

This extends not only to the fact of such use which in the present instance has no doubt been met, but to the character of it as well, which must have been sufficiently positive and pronounced to leave some abiding effect which cannot be said of it here. No old bearings, as it is to be noted, showing the proportions of the mixture, have been put in evidence, and, while the failure to produce physical exhibits such as these, which is sometimes insisted upon, may have been satisfactorily explained, the case lacks the confirmation which this would give. But, more than this, although bearings low in tin and high in lead are said to have been extensively sold, not a single customer is found to testify to their use, it being altogether incredible that, considering the decidedly superior wearing qualities which such bearings would possess, they should not have been thoroughly advertised and known. A single isolated instance realizing the invention has been proved. But that is all, and, under the circumstances, is not enough. Not only was it brought about by the merest chance, but it produced no permanent result, no mixture corresponding with the percentages obtained being adopted, nor the prevailing foundry practice changed. The contrary, of course, is asserted, but without avail. And the validity of the patent is not to be affected by anything of so little established account.

Let a decree be drawn in favor of the complainants, sustaining the patent, and directing an account, with costs.