ANTHRACITE SEPARATOR CO. v. POLLOCK et al.

(Circuit Court, M. D. Pennsylvania. December 31, 1909.)

No. 28, June Term, 1907.

1. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—COAL SEPARATOR.
   The Pardee patents, Nos. 629,590, 629,591, and 629,592, each for an ore and coal separator, specially designed for use in an anthracite coal breaker, and consisting of a sharply inclined spiral way or chute into which the coal is dumped, having the floor inclined toward the axis, which operates to separate the coal from the slate and bone during their descent by reason of their different specific gravity and frictional resistance, were not anticipated, and disclose invention; also *held* infringed.

2. PATENTS (§ 51*)—PRIOR USE—WHAT CONSTITUTES.
   A prior use, in order to negative novelty in a later patented device, must be something more than an accidental or casual one, and must be so far understood and practiced or persisted in as to contribute to the sum of human knowledge and be accessible to the public, becoming an established fact in the art.
   [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 66–74; Dec. Dig. § 51.*]

In Equity. Suit by the Anthracite Separator Company against James Pollock and the Parrish Coal Company for infringement of letters patent Nos. 629,590, 629,591, and 629,592, for an ore and coal separator, granted to Frank Pardee July 25, 1899. On final hearing. Decree for complainant.

All of the claims of each of the patents are relied on, and are as follows:

First Patent.

1. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet thereto and an outlet therefrom, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet of said spiral way.

2. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising an axial support, a spiral way forming a floor around said support and along which the substances pass, an inlet to and an outlet from said way, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet of said spiral way.

3. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising an axial support, a spiral way forming a floor around said support and along which the substances pass, an inlet to and an outlet from said way, and an abutment or wall at the outer edge of the spirals, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet of the spiral way.

### Second Patent.

1. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, said floor being provided with surfaces undulating transversely to the axis of the spirals.

2. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, the floor thereof being provided with continuous ledges or ways extending in the direction of the length of the spirals.

3. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, the floor thereof being composed of a plurality of overlapping alining sections and provided with surfaces undulating transversely to the axis of the spirals.

4. A machine for separating ore, coal, etc., by gravitation, certrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, the floor thereof being composed of a plurality of overlapping alining sections provided with continuous ledges or ways.

5. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet, said floor having surfaces undulating transversely to the axis of the spirals.

6. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way forming a floor along which the substances pass, an inlet to and an outlet from said way, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet, said floor being also provided with continuous ledges or ways extending in the direction of the length of the spirals.

### Third Patent.

1. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way constituting a floor over which the substances pass, an inlet thereto and an outlet therefrom, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet, and having segregated surfaces deviated from the plane of the floor and disposed at different points between the inlet and outlet of the spiral for directing certain substances inwardly on and along the spiral way.

2. A machine for separating ore, coal, etc., by gravitation, centrifugal action and frictional resistance, comprising a suitably-supported spiral way constituting a floor over which the substances pass, an inlet thereto and an outlet therefrom, said floor being provided with an incline the plane of which pitches toward the axis and toward the outlet, and with inwardly-extending surfaces deviating from the plane of the floor for changing the course of certain substances inwardly when passing through the machine.

Hubert A. Banning and F. W. Wheaton, for complainant.
Robert Watson and Beers & Grambs, for defendants.

ARCHBALD, District Judge. There is no particular difficulty in this case. The patents in suit are valid, and the defendant's infringement of them is clear. The structure which they cover is a device specially designed for use in an anthracite coal breaker, to assist in separating the coal from the slate and "bone," with which it is unavoidably mingled as it comes out of the mines. In the preparation of anthracite

coal for market, it has both to be cleaned and to be divided up into the different sizes which are current and have been found to be of convenient use. And for this purpose it is hoisted from the mine to the top of the breaker building, where it is dumped en masse, and allowed to descend over bars and screens and through rollers by which it is crushed, being sorted and cleaned in the process. The coal is sized and the dirt and culm removed from it by means of revolving sieves or screens, but the small pieces of slate and rock, and the commingled coal and slate, known as "bone," which are mixed up with the coal as it is mined, have either to be picked out by boys and men employed for that purpose, or separated from it mechanically by some such device as the one in suit.

Prominent, if not pioneer, among these, is the Septimus Thomas separator, patented April 6, 1875, with the several subsequent improvements upon it by the same and other inventors. The slate and coal in these are sent down together over an inclined plane or chute in which transverse openings or traps are provided at different points, of such width that the slate, which is of greater specific gravity and has greater frictional resistance than the coal, and does not therefore move with the same speed, drops into them and is carried off, while the coal attains a sufficient velocity to jump over them and go on by itself. The complainants make use of the same difference in specific gravity and frictional resistance, but as an additional means of separating the two materials take advantage also of the different effect exerted upon them by centrifugal force. The coal mixed with its impurities is dumped at the head of a sharply inclined spiral plane or way, which also has an inward pitch towards the axis about which the spiral winds. Transverse breaks and other retarding devices, extending partially across it, are also inserted to accentuate the difference of action of these forces upon the two materials and to arrest and divert the slate towards the inside. The coal, being lighter and the least affected by frictional resistance, moves with the greatest velocity down the chute, and is thus thrown to the outer edge by the effect of centrifugal force; while the slate, being heaviest and offering the greatest resistance, moves slowly, and gravitates to the center, yielding to the transverse pitch, and being further turned in that direction by the other means set in its path; and the bone, made up of combined slate and coal joined together in one piece, and partaking of the characteristics of each, assumes the middle of the way, occupying an intermediate place between both. Separating themselves from each other in this way, and automatically taking this relative position as they descend, which becomes more marked the further they go, each by itself falls into the receptacle provided for it at the end.

There is nothing like this anywhere to be found in the prior art. Spiral chutes for handling various commodities no doubt appear. And the difference in gravity and frictional resistance of slate and coal had been previously taken advantage of, as already stated, for the purpose of separating the two. But nowhere, in the same or any other connection, is there the combination of a spiral, inwardly inclined, descending plane, in which centrifugal force as a separating agency is additionally employed.

A spiral lump coal chute, designed by the defendant, Pollock, and constructed under his supervision at one of the breakers of the Kingston Coal Company, is advanced and confidently relied on as something of that kind. This chute was built in 1892, but did not go into operation until 1894, and was abandoned the next year, but was taken up again in 1906, and has been in use ever since. The floor of this chute was composed of heavy cast iron plates, having a slight inward pitch, not by design, but by accident, the structure not being so well supported on the inner side, and sagging by the excessive weight of the plates, which increased as it went down. After this chute had been in use for a time, it was noticed that the rock and slate and the coal were separated at the bottom. the one being found on the inside and the other on the outside of the track; and advantage was accordingly taken of this by cutting a hole in the landing platform and stationing a man there, who dropped the slate through it into a mine car, while the coal went on into a pocket beyond. This separation only occurred, however, in the early use of the chute, while the bottom plates were rough, and the material in consequence moved slow, and it disappeared when they became smooth with wear. But the effect for the time did not go unobserved, and the idea was advanced that it would make a good separator, although nothing further was done to that end.

There was nothing in this structure to make out an anticipating use. While to a certain extent, no doubt, there was a correspondence in form to the present device, and the separating effect of it was known, the inward pitch of the bottom plates, such as it was, which was admittedly essential to the action claimed for it, was a mere chance, due to the sagging of the inside timbers, and there is nothing to show that the result was traced to this source. Aside, therefore, from the fact that the chute was designed for an entirely different purpose, and conceding that, without regard to this, if the proper steps had been taken to secure permanent advantage of the discovery, a prior use, which would have defeated the present invention, might be made out, yet, all things considered, it is not entitled to be given this effect. The use which was made of the chute was temporary and crude; the function disappearing when the plates had worn smooth, and the whole chute being abandoned for every purpose for over ten years. Even if it was partially appreciated while it lasted, and the possibilities residing in it recognized, the operative principle does not appear to have been understood, so as to be intelligently reproduced. A prior use, in order to negative novelty, must be something more than an accidental or casual one. It must, indeed, be so far understood and practiced, or persisted in, as to contribute to the sum of human knowledge and be accessible to the public, becoming an established fact in the art. Gayler v. Wilder, 10 How. 477, 497, 13 L. Ed. 504; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Acme Flexible Clasp Company v. Carey Manufacturing Company (C. C.) 96 Fed. 344; Ajax Metal Company v. Brady Brass Company (C. C.) 155 Fed. 409. There is not the remotest approach to anything of that kind here. No doubt, as already stated, there was a conforming structure, with a somewhat similar function, and looking back with the light

which we now have we are able to see that the parties had the device of the patent almost, if not quite, in hand. But they did not follow it up, as they should, and, stopping short where the present inventor went on, it cannot be brought in now to anticipate and defeat what he has successfully achieved by himself.

Infringement is only feebly defended, and, as already intimated, is clear. The three patents in suit were issued to the same inventor on the same day, and are all, with slightly different features, practically for the same device; the specifications and drawings being almost identical in the first two. They all call for a "spiral way forming a floor," as to which it is contended that a floor in fact is meant; that is to say, one having a continuous surface, and not one broken up by gaps and jumps, as in the defendant's structure, which in this respect, it is said, is patterned after the Septimus Thomas separator, and is to be so classed. But there is no such limitation to be imposed upon it, from anything that appears. The word "floor," in the connection in which it is used, evidently means nothing more than the bottom of the inclined way along which the coal and slate are to move, however diversified and divided up it may be. And this is made clear by the specifications and drawings, particularly those of the third patent, where breaks or steps, if not gaps, are expressly shown. So, also, with regard to the first patent, in which the floor is to be "provided with an incline the plane of which pitches towards the axis." The word "plane" here is a noun, and not an adjective, and refers to the general set or trend of the floor, as indicated by an imaginary plane passing through it. It does not require that the surface should be of an even or unvarying inward cant, as contended, but is broad enough to cover the warped surface shown in the defendant's device. The only possible question upon this part of the case is with regard to the undulating surfaces, transverse to the axis, which are the controlling feature of the second patent, which it is claimed that the defendant does not have. Taking these as they appear in the drawings, it may be that the defendant does not offend. But the transverse gutters found in his structure, and designed to divert inwardly the slate and bone, are within the terms of the patents both in form and function, and must therefore be held to infringe, which the fact that they have also the falls and traps of the Thomas separator, over which the coal jumps, but which catch the slate and bone, does not relieve. Without following further, however, the distinctions and verbal refinements by which it is sought to avoid the device of the patents, it is sufficient to observe that both structural form and operative principle have been so manifestly appropriated that, with even less than the ordinary allowance for equivalents, the infringement is complete.

Let a decree be drawn in favor of the complainant, sustaining the patents and finding infringement, and referring the case to a master to take an account.