## DIAMOND PATENT CO. v. S. E. CARR CO.

(Circuit Court of Appeals, Ninth Circuit. October 13, 1914.)

No. 2376.

1. PATENTS (§ 81*)—ANTICIPATION — PRIOR USE — BURDEN OF PROOF TO ESTABLISH.

The burden rests upon the defendant in an infringement suit to establish the defense of prior use and consequent want of novelty in the patent, and because of the presumption of novelty arising from the issuance of the patent every reasonable doubt should be resolved against him.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*]

2. PATENTS (§ 75*)—ANTICIPATION—PRIOR USE—NATURE AND EXTENT OF USE.

Prior use, to invalidate a patent, must have been so far understood and practiced or persisted in as to have become an established fact, accessible to the public, and to have contributed definitely to the sum of knowledge.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97; Dec. Dig. § 75.*]

3. PATENTS (§ 328*)—VALIDITY—SHOWCASE.

The Weber patent, No. 801,944, for a showcase made of glass plates, the essential feature of which is the manner of joining the plates by means of a felt cushion placed between them and to which they are cemented, thereby making an elastic joint, held not anticipated by a prior use, nor invalid, because of insufficient description in the claims, nor because they in part describe a function.

4. PATENTS (§ 75*)—ANTICIPATION—"PRIOR USE"—IDENTITY OF ARTICLE.

A "prior use," to negative novelty and invalidate a patent, must have been of an article which was complete and capable of producing the result accomplished by the patented article, and not merely of one which by modification could be made to perform the same function.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 92–97; Dec. Dig. § 75.*]

5. PATENTS (§ 167*)—CONSTRUCTION—RESORT TO SPECIFICATION.

While a claim of a patent may not be enlarged by the language used in the specification, it may be illustrated thereby, and the specification and drawings may be resorted to for the purpose of better understanding the meaning of the claim.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 243; Dec. Dig. § 167.*]

Appeal from the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Suit in equity by the Diamond Patent Company against the S. E. Carr Company. Decree for defendant, and complainant appeals. Reversed.

The appellant, as the assignee of letters patent No. 801,944, issued to Fred Weber, of date October 17, 1905, brought a suit against the appellee for an injunction against infringement and for an accounting. The appellee defended

on the ground that the patent was anticipated by the prior knowledge and use of one W. G. Whitcomb in Kansas City, Mo. The court below found upon the evidence that the defense was sustained, and thereupon dismissed the bill.

The patent is for a showcase to be used in exhibiting small commercial articles for sale. In the prior art there had been showcases made of wooden frames with glass plates fixed in grooves therein, and later showcases had been made of glass alone, the plates of which were held together by metal clips, attached at the several corners of the glass plates. These not having proved satisfactory, glue or paste was inserted along the edges of the plates, which, becoming hard, assisted in holding them in place. Other showcases were made of glass with the edges of the plates glued or pasted together, and with bolts or screws inserted through the glass plates at the corners, in lieu of metal clips. Later, showcases were made all of glass, by pasting or gluing the edges of the glass plates together without clips, bolts, or screws; but they were not satisfactory, for the reason that, as soon as the glue or paste dried, the joints became rigid, and, there being no vibration or yield therein, the plates were easily broken.

Weber conceived the idea of inserting a strip of elastic or vibrating material between the glass plates, in order to prevent breakage in moving the same, and breakage from the expansion or contraction caused by heat or cold. In his specifications he described his improvement as residing particularly in the means of fastening one glass surface to another, or to the woodwork forming a part of the case. The object of this, he said, was to do away with drilling holes through the glass, and to dispense with metallic or other fastening devices, and to provide for a certain amount of elasticity of the joint "whereby a cushion effect is produced." He continued: "If the parts were rigidly united, severe shocks received by the showcase would tend to shatter the plates or displace the parts; but in the present invention the cushioned joint aids in maintaining the union of the parts, affording, as it does, an elastic or resilient joint, which eases the strain at the actual union or contact faces of the plates, thereby also greatly softening the effects of shocks received by the case. * * * The cement is applied to the felt superficially, forming a skin, as it were, on both sides of the felt, so as not to permeate the same. By uniting with the felt it would form a hard, practically homogeneous substance, thus destroying the resiliency of the felt. The cement should be applied to the felt when quite thick, so it will not soak into the felt."

The claims are as follows:

"1. A structure comprising a plurality of glass plates, the edges of which are spaced from the adjacent plates, a felt cushion filling the space between the adjoining plates, the plates being cemented to the felt; each plate being adapted to freely vibrate in its natural plane of vibration, and prevented by the felt cushion from imparting its vibration to the adjacent plates.

"2. A structure comprising a plurality of glass plates, an unconfined edge of one plate nearly, but not quite, meeting another plate, also with unconfined adjacent edge, an elastic material filling the space thus existing between the nearest adjacent surfaces of the plates, said plates being attached to the elastic material, whereby the plates, by reason of their unconfined edges and the intervening elastic material, can each vibrate or move in any direction independently."

Scrivner & Montgomery, of San Francisco, Cal., for appellant.

Skuse & Morrill and S. H. Cutting, all of Spokane, Wash., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON. District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The evidence shows without contradiction that the Weber showcase met with immediate success, that the demand for it grew to such an extent that Weber could not personally meet it, and that for that reason

he transferred the patent to the appellant. Weber testified that he had no trouble in repairing any of his cases, no trouble in setting them up, and no trouble from breakage in shipping the same, and one of the officers of the appellant testified to a wide and extended sale of the Weber showcase, and the marked success of his corporation in making and selling and in licensing others to manufacture the same throughout the United States.

[1, 2] The appeal herein presents the single question whether the evidence introduced to prove prior use is in law sufficient to negative the novelty of the invention. Concerning the nature of the evidence required to establish the defense of prior use, it was said, in Coffin v. Ogden, 18 Wall. 120, 21 L. Ed. 821:

"The invention or discovery, relied upon as a defense, must have been complete, and capable of producing the results sought to be accomplished, and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him."

In Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017, the court reaffirmed the rule that the burden of proof is upon the defendants to establish the defense of prior use and consequent want of novelty. "For," said the court, "the grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty. * * * Not only is the burden of proof to make good this defense upon the party setting it up, but it has been held that 'every reasonable doubt should be resolved against him.'" And in Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279, it was held that the prior use must be something more than an incidental or casual one. In Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504, it was held that the prior use must be so far understood and practiced or persisted in as to become an established fact, accessible to the public and contributing definitely to the sum of knowledge. Cases applying these rules are Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 Fed. 344, Anthracite Separator Co. v. Pollock (C. C.) 175 Fed. 108, Ramsay v. Lynn (C. C.) 187 Fed. 218, and Ajax Metal Co. v. Brady Brass Co. (C. C.) 155 Fed. 409. Under the rule established by these decisions, we are required to view with caution and careful scrutiny evidence which is introduced to show a prior use that destroys the pecuniary value of a patent, which has met with commercial success and has been of value to the community.

[3] The showcases which are said to be evidence of prior use were manufactured in 1899 and 1900, in Kansas City, Mo., by W. G. Whitcomb, a cabinet maker, who made one lot of ten for the Cooper Drug Company of Joplin, Mo., and a lot of five for the Federmann Drug Company of Kansas City. Whitcomb testified that the Joplin cases had screws or bolts in the corners, and some of them had one also in the middle, and that those made for Federmann were substantially the same—that the glass plates in all those cases were fastened together with a preparation which he made himself. From his own evidence and the testimony of another witness, the "preparation" seems to have been similar to ordinary liquid glue, a product that could readily be poured from one receptacle to another. Whitcomb, who had thereto-

fore and since made ordinary showcases, testified that he did not like to make all-glass showcases, and that, if a customer wanted one, he would talk him out of it. He said: "My custom has been to advise people not to take them." The witness Jackson testified that, in a recent conversation with Whitcomb, the latter had told him that all-glass cemented showcases were no good. "He denounced the cases as being no good, on account of breakage that might occur in them, and the inaccessibility of the joints to be repaired." Whitcomb testified that the cases he made for the Cooper Drug Company and Federmann had felt joints, and that he used felt in the joints of these all-glass cemented cases "for the vibration of the case," and that he made some without the felt, simply stuck one plate of glass on the other, and found it was so solid any little jar would break it, and then he thought of the felt to give the elastic movement and make an elastic joint, and he testified that, while the joints in those cases are not hard and fixed, they appear to be solid, but, he added, "there must be some give to them or they would break."

But the evidence is not convincing that Whitcomb's idea in using the felt was to furnish an elastic cushion between the plates. It seems, rather, to indicate that his idea was to insert a porous medium between the plates, which, when it became saturated with glue, would present a more effective binding of the plates than could have been accomplished by glue or paste alone, and that the rubber strips which he employed in one or two instances must also have been used for the purpose of making a firmer joint, for it is common knowledge that such rubber soon becomes hard and loses its resiliency. He admitted that at first his glue permeated the felt, and he said:

"And then I got a felt that we had treated waterproof. I can't think what we called it. You can take any piece of cloth, and have the pieces sort of waterproofed, so as to keep your cement from soaking through."

But there is absolutely no evidence that in any of the showcases for the Cooper or the Federmann drug store was there any use of a waterproof felt. If, indeed, Whitcomb ever employed waterproof felt, it must have been at some subsequent experiment. In short, Whitcomb's all-glass showcases were not successful. He did not consider them successful, and he abandoned the idea of constructing them.

Mr. Federmann, who was called as a witness for the appellee, testified: "There is no elasticity in the joints at all; none that I know of." It is true that he further testified that whatever elasticity followed from the use of the felt in the joints between the glass existed in those showcases, and that any elasticity resulting from that method of construction existed in those cases. That was merely to state a truism. Its effect was not to show that there was elasticity in the joints, and it does not detract from the testimony of the witness that there was no elasticity in the joints. It may be conceded that, if there were any elasticity in joints in which the felt had been saturated by glue, Whitcomb secured it in the joints which he made, and which, as we have seen, were not satisfactory. To make such a joint was not to anticipate Weber's idea of using felt strips in combination with a'

plastic cement on each side thereof, which was of such quality as to hold, but not to penetrate, the felt, and to leave it with all its natural elasticity as a cushion between the plates. It does not appear, therefore, that Whitcomb, in making his all-glass showcases, had in mind the idea which is at the basis of the Weber invention, an elastic medium between the plates.

It is not disputed that, when one of the officers of the appellant approached Whitcomb in 1906 with a view to giving him a license to manufacture the Weber showcases upon a royalty basis, Whitcomb, after examining the model, stated that he—

"did not think we would find it a good proposition, on account of the elasticity which we had in the joints, and he told me then and there that he had tried cemented showcases, but had found them unsatisfactory. In fact, he said they were so unsatisfactory he was going to discontinue the manufacture of them."

It thus appears that, before any litigation arose over the patent, Whitcomb specified as objectionable the very feature which in the Weber showcase has caused its success, and the absence of which in the cases made by Whitcomb undoubtedly caused their failure, for eight out of ten cases made by him for the Cooper Drug Company and two of those made for Federmann were broken, and the witness Holm, who repaired "four or five" of them, testified that they were put together with some kind of composition, which seemed to be a very hard substance after it dried, and "it made a hard, solid joint," and Jackson, who repaired two of them, testified that the joints were "solid and rigid."

The secretary of the appellant, who examined the showcases relied upon to prove prior use testified that they are—

"what I call solid joints all through, because the material used (I would call it glue) would permeate the felt and make a hard joint. Whatever material he used permeated the felt, and bolts were used as before described. Three distinct differences between the Federmann case and the Weber patent case are: The solid joints; the use of bolts, as above described; and the material used in the construction of the Federmann cases which (whatever it is) permeates the felt, making a solid jointed case, which was not the case in the patent. It was simply the process of putting these plates together with an elastic joint; that is the substance of the patent, as I understand it. The Joplin cases are the same composition as the Federmann, and my testimony with reference to the Federmann cases applies to the Joplin cases."

The evidence, as we view it, in the light of the decisions above quoted, fails to meet the heavy burden of proof imposed upon the defendant to show that Whitcomb constructed showcases which anticipated the Weber invention. It does not prove that Whitcomb conceived the idea of an elastic joint, or that, if he conceived it, he gave to the public the benefit thereof; for, if the idea was embodied in any of the showcases which he constructed, it was not a visible embodiment, or one that could be seen by a mechanic of ordinary intelligence, unless he examined it for that purpose. In Acme Flexible Clasp Co. v. Cary Mfg. Co. (C. C.) 96 Fed. 344, affirmed by the Circuit Court of Appeals, 101 Fed. 269, 41 C. C. A. 338, Judge Townsend said:

"I therefore understand the law on this subject to be that the mere secret practice of a process or the physical presence of a product or manufacture in

this country is insufficient as an anticipation, unless and until the public acquires, or has opportunity to acquire, therefrom such knowledge as would enable one skilled in the art to practice the invention. Such alleged anticipation, whether by foreign printed publication or physical presence in this country, must so embody the complete patented article, or be so substantially like it, that a specification could be based thereon."

[4] The novelty of an invention is not negatived by a prior useless process or thing, nor is anticipation made out by a device which might, with slight modification, be made to perform the same function. The invention must have been complete, and capable of producing the result. One should not be deprived of the results of a successful effort merely because some one else has come near it. Sayles v. Chicago & N. W. R. R. Co., 3 Biss. 52, Fed. Cas. No. 12,415. In the Barbed Wire Patent, 143 U. S. 275–284, 12 Sup. Ct. 443, 447 (36 L. Ed. 154), Mr. Justice Brown said:

"The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined that they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer."

It is contended that all of the first claim after the word "felt," and all of the second claim after the word "material," is invalid as being functional and not patentable, that a patent can cover only the concrete physical means employed to accomplish the result, and that the claims thereof, being self-imposed, are binding on the patentee, and all that it does not claim is abandoned to the public, and that the claims cannot be enlarged or extended in any particular by reference to the specifications, descriptions, or illustrations of the patent; and it is argued that the patent in the present case covers only the all-glass joints of the showcase, and does not include the character of the adhesive substance to be used. It is true that in the claims no specific mention is made of the nature of the adhesive substance that is used, but the claims do in effect say that the plates are so cemented to the felt that each plate is adapted to freely vibrate in its natural plane of vibration, "and prevented by the felt cushion from imparting this vibration to the adjacent plates." This result could not be obtained without the use of an adhesive cement that would not penetrate the cushion and destroy its elasticity, and the specifications plainly call for the use of such a cement. The appellee's contention that a patentee can claim nothing beyond the terms of his claim, and that he must be limited to the invention covered thereby, is well founded. Lehigh R. R. Co. v. Mellon, 104 U. S. 112, 26 L. Ed. 639; Yale Lock Co. v. Greenleaf, 117 U. S. 554, 6 Sup. Ct. 846, 29 L. Ed. 952; Harder v. United States Piling Co., 160 Fed. 463, 87 C. C. A. 447.

[5] But, while the claim may not be enlarged by the language used in the specifications it may be illustrated thereby, and the specifications and drawings may be resorted to for the purpose of better understand-

ing the meaning of the claim. Howe Machine Co. v. National Needle Co., 134 U. S. 388, 10 Sup. Ct. 570, 33 L. Ed. 963. In Unhairing Co. v. American Co., 198 U. S. 399, 25 Sup. Ct. 697, 49 L. Ed. 1100, the court said:

"In making his claim the inventor is at liberty to choose his own form of expression, and while the courts may construe the same in view of the specifications and the state of the art, they may not add to or detract from the claim."

In Winans v. Denmead, 15 How. 329, 340 (14 L. Ed. 717), Mr. Justice Curtis said:

"Now, while it is undoubtedly true that the patentee may so restrict his claim as to cover less than what he invented, or may limit it to one particular form of machine, excluding all other forms, though they also embody his invention, yet such an interpretation should not be put upon his claim if it can fairly be construed otherwise, and this for two reasons: (1) Because the reasonable presumption is that, having a just right to cover and protect his whole invention, he intended to do so. * * * (2) Because specifications are to be construed liberally, in accordance with the design of the Constitution and the patent laws of the United States, to promote the progress of the useful arts, and allow inventors to retain to their own use, not anything which is matter of common right, but what they themselves have created."

In Seymour v. Osborne, 11 Wall. 516, 547 (20 L. Ed. 33), Mr. Justice Clifford said:

"Where the claim immediately follows the description of the invention, it may be construed in connection with the explanations contained in the specifications."

In 1900 Washer Co. v. Cramer, 169 Fed. 629, 633, 95 C. C. A. 157, 160, Judge Gray said:

"The combination or description of the standard washer, or of this Wearne tub, can be read, it is contended by defendants' counsel, into this first claim. This may be true, if we stick in the bark, by looking at the language of the claim, dissociated from the specifications; but no invention can be practically or fairly understood or explained, if such dissociation is absolutely adhered to. As we have already shown, the element described in the first claim, as 'means for actuating said lever,' must not be taken to be any means, such as impracticable hand power applied to the lever, but the efficient practical means described in the specifications. Reading the claim and the specifications together, the invention of the patentee was clearly such an application of mechanical power as would oscillate the tub with all the advantages afforded by the resiliency and retardation of the springs of the standard washer preserved."

In Century Electric Co. v. Westinghouse E. & Mfg. Co., 191 Fed. 350, 354, 112 C. C. A. 8, 12, Judge Sanborn, in applying the rule that the court should seek to ascertain from the terms of the patent, in the light of the circumstances, what was the intention of the contract between the government and the patentee, said:

"This intention should be deduced from the entire contract, and not from any part of it, or without any part of it, because they did not agree to it, or to any part of it, without every other part of it. The specification, which forms a part of the same application as the claims, must be read and interpreted with them, not for the purpose of limiting or contracting, or of expanding, the latter, but for the purpose of ascertaining from the entire agreement, of which each is a part, the actual intention of the parties, and that:

intention, when ascertained, should prevail over the dry words and inapt expressions of the contract evidenced by the patent, its specification and claims."

In Smead Warming & Ventilating Co. v. Fuller & Warren Co. et al., 57 Fed. 626, 6 C. C. A. 481, Judge Shipman said:

"The construction to be given to his patent must correspond with the extent of his invention. The actual invention, if in conformity with the language of the claims, should control in the construction of patents. A strict construction should not be resorted to, if it becomes a limitation upon the actual invention, unless such construction is required by the claim."

We are of the opinion that, while the latter portion of the claims in the case at bar do, in a sense, describe a function, they also serve to describe the manner in which the plates are "cemented to the felt," as those words are used in the claims, and as shown by the specifications, and that by resorting to the specifications, for the light which they afford on that subject, we do not enlarge the claims, but construe them according to their intention, as authorized by the decisions above cited. No one familiar with the art, after reading the claims, and making the permissible reference to the specifications, could have any doubt as to what was the particular thing which the patentee claimed as new, and what was the relation of each part to the combination.

The decree is reversed, and the cause is remanded for further proceedings.