INDIVIDUAL TOWEL & CABINET SERVICE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 1231, 12586.    Decided October 21, 1926.

> In 1911 an individual invented a device and made application for United States letters patent thereon. On April 9, 1912, a patent covering the design of the invention was issued, leaving applications for patents covering the principle and certain mechanisms pending. The use of the device in the business of the partnership which owned it prior to the sale thereof to the petitioner showed a saving of $7,500 per annum. On October 29, 1912, the patent and applications were paid in to the petitioner for $74,970.09 par value of stock. *Held,* that the patent and patent applications were property and had an actual cash value at the time paid in and on March 1, 1913, of $74,970.09, and should have been included in invested capital for the years 1917 to 1921, inclusive, at that value, subject to the limitations prescribed by law. *Held, further,* that when the corporation on March 23, 1917, sold certain of its rights under the patent acquired for stock and the patents issued upon applications so acquired, for $17,790.81, and retained a license thereunder, it was thereafter entitled to an annual deduction for exhaustion of the license on the basis of the life of the principal patent granted October 19, 1915, of a pro rata portion of the remaining unexhausted value of its capital investment of $50,870.52.

*William T. Church, Esq.,* and *Egbert Robertson Esq.,* for the petitioner.
*Arthur H. Fast, Esq.,* for the respondent.

The proceeding Docket No. 1231 involves deficiencies for the years 1917, 1918, 1919 and 1920, in the amounts of $10,949.36, $2,735.46, $2,579.81, and $310.84, respectively. The proceeding Docket No. 12586 involves a deficiency for the year 1921 in the amount of $1,690.12. The issues in each proceeding are the same and are as follows:

(1) The actual cash value on October 29, 1912, of a patent and applications for patents acquired for stock for the purpose of invested capital.

(2) The fair market value on March 1, 1913, of the patent and applications for the purpose of the deduction for exhaustion, wear and tear during the taxable years.

(3) Whether the surplus for the taxable years was correctly reduced by the Commissioner on account of the tax due within the year upon the income for the preceding year.

### FINDINGS OF FACT.

Petitioner is an Illinois corporation with principal office at Chicago. Jacques Rousso has been engaged since 1903 in the business of operating wardrobe and washroom concessions in checkrooms, restaurants, hotels, theatres, excursion boats and like places. Since 1907, Sam Wolf has been engaged in a like business, in partnership with Rousso, under the firm name of Rousso & Wolf. In 1911 the partnership was supplying approximately 8,000 hand towels a day under its concession contracts in about 30 public washrooms in Chicago. By reason of the nature of this business, the loss of towels from misuse or pilferage amounted to at least 10 per cent daily, or approximately 700 towels a day, constituting a money loss in excess of $21 a day, or $7,500 a year.

The problem of overcoming the loss of towels was frequently discussed between Rousso and Wolf from the beginning of their association in 1907. In the summer of 1911, Rousso devised a plan to prevent this loss, which was substantially the idea embodied in the invention hereinafter mentioned. In December, 1911, Wolf perfected a device on to which a large supply of towels could be locked and at the same time be fully serviceable to the public. The arrangement of the device was such that a supply of clean towels lay on a shelf approximately five feet from the floor, with a small rod to which the towels were fastened, leading to a container on the floor, into which the towels, after being used, would automatically drop. The shelf for the clean towels, the rod and the container for soiled towels were part of a cabinet which the inventor proposed to place at a convenient point in washrooms where towels were supplied. Rousso immediately submitted his plan to his attorney for the making of an application for United States letters patent. At the same time he caused a model of the cabinet to be made and installed it in one of the washroom concessions operated by the partnership. The device was immediately successful and completely prevented the loss of towels. The partnership thereafter had the device manufacturd and installed it in the various public washrooms in which it held concession contracts. In May, 1912, the partnership of Rousso & Wolf undertook a separate business for the purpose of manufacturing and marketing the device under the trade-name of Individual Towel &

Cabinet Service Co., not incorporated. During the summer of 1912, they bought linen, machinery, horses, wagons and other necessary equipment and engaged in the manufacture of cabinets and towels and sold and installed them in a large number of business houses, banks, public service corporations, saloons, billard halls, restaurants and other places in Chicago, New York, Boston, Buffalo, St. Louis, Louisville, Duluth, Minneapolis, San Francisco, Jacksonville, Fla., Danville, Ill., Marion, Ind., and elsewhere throughout the United States.

By October 29, 1912, this branch of the business had tangible assets of a value in excess of $25,000. Its operations had demonstrated the value of the device by its use by Rousso and Wolf in more than 60 places in which they held concession contracts. On October 29, 1912, the petitioner corporation was organized with a capital stock of the par value of $100,000. At the first meeting of the directors of the petitioner, Rousso submitted to the corporation the following proposition:

I hereby offer to sell and assign to your Company by good and sufficient assignment all of the property pertaining to the business now conducted by me at 160 North Fifth Avenue, Chicago, consisting of a stock of cabinets, towels, towel vending devices and other supplies, machinery, furniture and fixtures, horses and wagons, and other personal property belonging to said business, together with the good will of said business and all patents and patent rights belonging thereto for the sum of one hundred thousand dollars ($100,000), and to accept in payment therefor the capital stock of your company at the par value thereof to the extent of said sum, it being expressly understood and agreed that the value of said property, good will and patent rights is one hundred thousand dollars ($100,000) and that the said stock shall be issued to me or to my nominees as fully paid and non-assessable.

In the event of the acceptance of this offer, I direct that the stock shall be issued as follows:

To Jacques Rousso, 989 shares;
To Sam Wolf, 10 shares; and
To Rose Rousso, 1 share.

Thereupon, the directors adopted a resolution accepting the proposition of Rousso, and $25,029.91 par value of stock was issued for tangible assets having an actual cash value at that time of that amount (the value of the tangible assets is not in dispute), and $74,970.09 par value of stock was issued for the patent and patent applications and the invention in question.

The device had demonstrated that its use resulted in an annual saving to Rousso and Wolf of at least $7,500, and, when paying it in to the corporation for stock, they adopted as its value the saving over a ten year period, or $75,000. In arriving at this value they did not take into consideration future profits on royalty contracts, but figured that the device would be worth $75,000 to them even if the patent for which they had made application should not be granted.

Prior to the adoption of the device, the cost of serving loose towels in public washrooms in Chicago was from 60 cents to $1.25 a hundred. By means of the device, Rousso and Wolf furnished locked-on towels in Chicago at 35 cents a hundred and made a profit.

On July 20, 1915, patent No. 1,147,552 was granted upon the counting mechanism in connection with the cabinet, and on October 19, 1915, patent No. 1,157,046 was granted upon the principle of the towel cabinet upon the applications theretofore acquired by the petitioner for stock.

The actual cash value of the patent and patent applications paid in for stock on October 29, 1912, and the fair market value thereof on March 1, 1913, was $74,970.09.

Between the date of incorporation and March 23, 1917, petitioner became indebted to Rousso and Wolf for money advanced by them in the sum of $17,790.81.

On March 23, 1917, these individuals submitted to the corporation a proposition that the corporation sell, assign, set over, deliver and release to them the patents theretofore transferred to it for stock, in consideration of the cancellation by Rousso and Wolf of $17,790.81 due them by the corporation, the corporation to retain an exclusive license under the patent to manufacture and sell towel cabinets in Cook County, Ill., and a nonexclusive license to do so in other territory throughout the United States. This proposition was accepted by the corporation.

Thereafter, Rousso and Wolf granted 26 licenses to various persons and corporations throughout a small portion of the United States at an aggregate minimum annual royalty in excess of $191,000.

The Commissioner held that the patent and applications for patents had no cash value at the time paid in for stock and no fair market value on March 1, 1913; wherefore, he denied petitioner any invested capital on account thereof and refused to allow it any deduction for the exhaustion of the patent granted in 1915, or for the exhaustion of the license agreement retained by the corporation upon the transfer of patent to Rousso and Wolf on March 23, 1917. As a result of this determination, the Commissioner held that the cancellation by Rousso and Wolf of the indebtedness of $17,970.09 was a forgiveness of indebtedness to the corporation and constituted income to it for the taxable year.

### OPINION.

LITTLETON: The two principal issues involved concern the actual cash value on October 29, 1912, and the fair market value on March 1, 1913, of the patent and patent applications relating to the towel cabinets which were acquired for stock.

That the applications for patents covering the principle of the towel cabinet and certain mechanisms for use in connection therewith were property is fully supported by various decisions of the courts and needs no argument here. *Hammond* v. *Mason & Hamlin Organ Co.*, 92 U. S. 724; *Hendrie* v. *Sayles*, 98 U. S. 546; *Gayler* v. *Wilder*, 10 How. 477; *De La Vergne Machine Co.* v. *Featherstone*, 147 U. S. 209; *In re Myers-Wolf Mfg. Co.*, 205 Fed. 289; *Railroad Co.* v. *Trimble*, 10 Wall. 367; *Nicolson Pavement Co.* v. *Jenkins*, 14 Wall. 452; *Burton* v. *Burton Stock-Car Co.*, 171 Mass. 437; 50 N. E. 1029; *Binney* v. *Annan*, 107 Mass. 94; *Somerby* v. *Buntin*, 118 Mass. 279; *Lamson* v. *Martin*, 159 Mass. 557; 35 N. E. 78.

We are of the opinion from all of the evidence that the actual cash value of the patent and applications for patents at the time paid in for stock and on March 1, 1913, was $74,970.09, as claimed. A number of witnesses who had been engaged in the business of supplying towels in washrooms for a number of years, and who were fully qualified to express an opinion as to the value of the towel cabinet at the time it was acquired by the petitioner, testified that in their opinion the applications for a patent thereon were worth between $75,000 and $100,000. One of these witnesses who had for some time been in the concession business, in connection with which he was supplying about 20,000 towels a day, acquired some of the cabinets in 1912 and found that the use of the cabinets entirely eliminated the loss, which he had theretofore suffered, of 50 per cent of the towels used. Upon the incorporation, this individual endeavored to acquire 51 per cent of the stock at $100 a share, but Rousso and Wolf declined to sell. He testified that his purpose at that time was to acquire control of the corporation, that he would have been willing to purchase the entire capital stock at par, and that he had more than sufficient cash to pay for the same. He did not attempt to acquire all of the stock at $100 a share for the reason that the owners thereof refused to sell any amount. Other witnesses engaged in the same business testified that they were interested in acquiring stock of the petitioner upon its organization, at par, but found that the owners of the stock would not sell it.

The patent and applications for patents should therefore have been included in invested capital for each of the taxable years at a value of $74,970.09, subject to the limitations prescribed by law.

On March 23, 1917, the unexhausted cost and March 1, 1913, value of the patent and applications, which became merged in the patent issued October 19, 1915, covering the principle of the device, was $68,661.33. The exhaustion of the group of patents upon the basis of the life of the principal patent granted October 19, 1915, from that date to March 23, 1917, was $6,308.76.

On March 23, 1917, the petitioner disposed of a portion of its capital asset represented by these patents for $17,790.81, leaving the remaining unexhausted value of the asset, of $50,870.52, represented by the patent license which it retained. The petitioner was therefore entitled to a deduction in each of the taxable years of a pro rata portion of $50,870.52 for the exhaustion of the license over the life of the principal patent granted October 19, 1915.

The Commissioner correctly reduced surplus on account of the tax due within the taxable years upon the income for the preceding year. *Appeal of Russel Wheel & Foundry Co.*, 3 B. T. A. 1168.

> *Judgment will be entered on 15 days' notice, under Rule 50.*